**UNITED STATES of America**

v.

**Joseph M. McDADE, Defendant.**

**Cr. A. No. 92–249.**

United States District Court,
E.D. Pennsylvania.

May 6, 1993.

Nicholas C. Harbist, James J. Eisenhower, Asst. U.S. Atty., for U.S.

Sal Cognetti, Jr, Foley, Cognetti & Cowley, Scranton, PA, Abbe David Lowell, Brand & Lowell, Washington, DC, G. Robert Blakey, Professor of Law, Notre Dame, IN, James D. Crawford, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for defendant.

Steven R. Ross, Charles Tiefer, Richard P. Stanton, Office of Gen. Counsel, Washington, DC, for Speaker and Bipartisan Leadership Group—amici curiae.

### *OPINION*

GAWTHROP, District Judge.

Defendant, Joseph M. McDade, a United States Congressman, is charged with accepting illegal gratuities, conspiracy, and racketeering. Currently before the court is a panoply of pretrial motions, including four motions to dismiss various portions of the indictment, a motion to transfer the trial of the case, and some discovery and evidentiary motions, all of which have been exhaustively briefed and argued. Upon the following reasoning, I find that (1) the indictment does not violate the Speech or Debate Clause of the United States Constitution, nor would the trial of this case be hopelessly doomed to

violate that Clause, (2) the indictment adequately alleges all the elements of the crimes charged, (3) venue is proper in the Eastern District of Pennsylvania, (4) the defendant does not have standing, at this stage, to challenge the government's use or introduction of wiretap evidence at trial, and (5) the defendant is not entitled to a bill of particulars or to pretrial disclosure of the government's proof of his connection to the alleged conspiracies.

## BACKGROUND

Congressman McDade has represented Pennsylvania's Tenth Congressional District in the United States House of Representatives since 1962. He has been the ranking minority member of the House Small Business Committee since 1982, and he has been the ranking minority member of the House Appropriations Committee, Subcommittee on Defense Appropriations, since 1985.

On May 5, 1992, a grand jury in this district returned a five-count indictment against Mr. McDade charging him with official misconduct from 1983 through 1988. Counts One and Two allege that Mr. McDade accepted cash, travel, vacations, and golf equipment from United Chem Con Corporation ("UCC") in return for his assistance in securing Navy and Postal Service contracts for UCC. Counts Three and Four allege that Mr. McDade accepted cash, travel, a vacation, and a scholarship for his son from Grumman Corporation, Kane Paper Corporation, and Sperry Corporation in return for his assistance in securing Army and Navy contracts for Grumman and Sperry. Counts One and Three charge Mr. McDade with violating 18 U.S.C. § 371 (conspiracy), and Counts Two and Four charge him with violating 18 U.S.C. § 201(c)(1)(B) (acceptance of an illegal gratuity by a public official).

Count Five charges Mr. McDade with violating 18 U.S.C. § 1962(c) (participation in the affairs of an enterprise through a pattern of racketeering activity). In Count Five, the government alleges that Mr. McDade used his congressional offices and staff as a racketeering enterprise by soliciting and accepting bribes and illegal gratuities and by committing extortion. In addition to incorporating the factual allegations of Counts One through Four, Count Five also alleges that Mr. McDade demanded or accepted cash from UCC to sponsor a concert, that he demanded or accepted travel from Westland Oil Company, that he demanded or accepted a trip to the NCAA Basketball Final Four from Kane Paper, and that he demanded or accepted travel, vacations, and a couch from GSGS & B and GSGS & B, Inc., in return for his assistance in obtaining government contracts for those companies.

Congressman McDade now moves to dismiss the indictment on the grounds that it violates the Speech or Debate Clause of the United States Constitution and that each of its five counts is inadequately pled. Mr. McDade also requests that the court transfer this case to the Middle District of Pennsylvania for trial. In addition, both Mr. McDade and the government have submitted a number of discovery and evidentiary motions. I shall address each of Congressman McDade's motions in this Opinion, and I shall dispose of the government's motion in a separate, contemporaneous Order.

## DISCUSSION

### THE SPEECH OR DEBATE CLAUSE

The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and *for any Speech or Debate in either House, they shall not be questioned in any other Place.*

U.S. Const. art. I, § 6, cl. 1 (emphasis supplied). Congressman McDade moves the court to dismiss the indictment because, he argues, it violates the Speech or Debate Clause.

*History and Supreme Court Jurisprudence*

The immunization of parliamentary speeches and debates against criminal and

civil prosecution is firmly rooted in the Anglo–American system of government. The English Bill of Rights of 1689 represented the climax of centuries of parliamentary struggle against English monarchs, finally establishing that Parliament, not the King or Queen, was supreme. Central to establishing parliamentary supremacy was the elimination of the monarchs' utilization of the criminal and civil law to suppress parliamentary speech and to intimidate legislators. It was not uncommon for the King or Queen to arrest Members of Parliament for advocating positions contrary to the Crown's, and then to imprison those Members in the Tower of London, subject only to appeal to often obsequious royal judges. To put an end to this practice, and to announce its independence from the Crown, Parliament included in the Bill of Rights the following clause: "That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be questioned in any court or Place out of Parliament." Bill of Rights, 1689, 1 W. & M., sess. 2, ch. 2, § 9 (Eng.).

The Framers of the United States Constitution took great pains to insure that their document would set up three independent and co-equal branches of government. Given their experience with the English system, our Founding Fathers recognized that the legislature could not hope to be truly independent of the executive unless the legislative acts of its members were immunized from prosecution by the executive. Using the English Bill of Rights as a model, the Framers wrote the Speech or Debate Clause into the United States Constitution.

However, unlike the English system, in which Parliament is supreme, ours is a system of three co-equal branches. As the Supreme Court has observed, "[o]ur speech or debate privilege was designed to preserve legislative independence, not supremacy. Our task, therefore, is to apply the Clause in such a way as to insure the independence of the legislature without altering the historic balance of the three co-equal branches of Government." *United States v. Brewster*, 408 U.S. 501, 508, 92 S.Ct. 2531, 2535, 33 L.Ed.2d 507 (1972).

■ More than two centuries have passed since ratification of the Constitution, and our legislative system has grown increasingly complex. Today, although members of Congress still make speeches and engage in debates on the floors of the House and Senate, most of the grinding of legislative machinery occurs outside the chambers of the Houses themselves—in congressional offices and committee rooms. Consequently, in an effort to carry forward the Speech or Debate Clause's purpose of immunizing legislative acts against criminal or civil prosecution, the courts have extended the Clause beyond the chambers' doors. For example, the Supreme Court has held that acts undertaken by congressional aides, as agents of members of Congress, which would have been legislative acts had they been performed by the members themselves, are protected by the Speech or Debate Clause. *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). The Court has also extended the protection of the Clause to committee reports, resolutions, and votes. *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). The Clause also protects members of Congress when they are investigating and gathering information about matters which are or may become the subject of legislation. *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975).

■■ However, the Supreme Court has also held that the Speech or Debate Clause does not reach attempts by a member of Congress to influence the executive. *United States v. Johnson*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966). In addition, although congressional speeches and votes are protected, a promise to deliver a speech, to vote, or to solicit votes in the future is not protected by the Clause. *United States v. Helstoski*, 442 U.S. 477, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979). The taking of a bribe by a member of Congress is likewise not protected. *United States v. Brewster*, 408 U.S. 501, 92 S.Ct. at 2531 (1972).

In *Brewster*, the Supreme Court held that "the Speech or Debate Clause prohibits inquiry only into those things generally said or done in the House or the Senate in the

performance of official duties and into the motivation for those acts." *Brewster*, 408 U.S. at 512, 92 S.Ct. at 2537. The Clause "does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself." *Id.* at 528, 92 S.Ct. at 2545. The Court held that "political matters," such as "errands" performed for constituents and assistance in securing Government contracts, are not protected by the Clause. *Id.* In summing up its prior jurisprudence, the Court wrote, "the Speech or Debate Clause has been limited to an act which was clearly a part of the legislative process—the *due* functioning of the process." *Id.* at 516, 92 S.Ct. at 2539 (emphasis in original). Finally, the Court observed that "the privilege is broad enough to insure the historic independence of the Legislative Branch, essential to our separation of powers, but narrow enough to guard against the excesses of those who would corrupt the process by corrupting its Members." *Id.* at 525, 92 S.Ct. at 2544.

*Congressman McDade's Arguments*

█ The common thread running through all of the Supreme Court's opinions, and almost all of the lower court opinions, is that analysis under the Speech or Debate Clause is act-based. The courts have interpreted the Clause as protecting legislative acts only, and most of the cases have turned on the determination of whether a particular action of a member of Congress was or was not a legislative act. The question Congressman McDade now raises is whether the Clause also protects legislative status, and in particular, committee status.

█ The indictment itself includes references to Mr. McDade's committee positions, and the government admits that it intends to prove that Mr. McDade was able to use his status as the ranking minority member on two House committees[1] to his personal advantage. The government intends to show that Mr. McDade's committee status made him a more attractive target for potential bribers, and that the alleged gratuity-givers and bribers in this case viewed Mr. McDade

not as just another member of Congress, but as a very powerful member of Congress. Mr. McDade, joined by the Speaker and Bipartisan Leadership Group of the House of Representatives as *amici*, argues that the indictment, by its very mention of Congressman McDade's committee status, violates the Speech or Debate Clause. Further, Mr. McDade and the Leadership Group argue that, in order for the government to show, as it must, that the alleged bribers' and gratuity-givers' beliefs that Mr. McDade was more powerful than an ordinary member of Congress were reasonable, it will have to introduce evidence of the congressional committee process itself, which would violate the Speech or Debate Clause. Alternatively, they argue that in order to show that the beliefs of the alleged bribers and gratuity-givers were not reasonable, Congressman McDade will be forced to introduce evidence about the committee process and his own legislative acts. Thus, the argument goes, Mr. McDade, in order to defend himself, will be impelled to introduce evidence that, if introduced by the government, would violate the Speech or Debate Clause. Since the Speech or Debate Clause is not merely an evidentiary rule, but a Constitutional bar against prosecutions of Members of Congress for their legislative acts, Mr. McDade and the Leadership Group argue that government cannot force Mr. McDade to introduce the protected evidence himself.

Congressman McDade argues that because the Speech or Debate Clause not only grants a privilege to members of Congress, but also acts as the people's safeguard of legislative independence and free discourse, a member of Congress has the right not to have to stand trial at all in defense of his legislative acts, and not to be confronted with the decision of whether to introduce privileged information in his defense. According to Mr. McDade, to prevent him from introducing evidence protected by the Speech or Debate Clause in his defense would be to deprive him of his Sixth Amendment rights to a compulsory process to confront the witnesses

---

1. I realize, of course, that the two "committees" to which I refer are actually one committee and one subcommittee. However, for reasons of grammatical simplicity, I shall refer to both as "committees."

against him; to permit the government to forge ahead with a prosecution which would force Mr. McDade to introduce privileged evidence in his defense would violate both Mr. McDade's rights and the people's rights under the Speech or Debate Clause. According to Mr. McDade, trying this case would force him to choose between his Sixth Amendment rights and his and the people's Speech or Debate Clause rights, a choice which would itself violate the Speech or Debate Clause.

 This argument does carry some persuasive force, but it is only relevant if the evidence which Mr. McDade professes to be protected by the Speech or Debate Clause—his legislative and committee status and the congressional committee process itself—actually *is* protected by the Speech or Debate Clause. I thus turn to the ultimate question on this issue: is legislative status protected by the Speech or Debate Clause? [2]

*The Speech or Debate Clause and Committees*

As far back as the early Nineteenth Century, courts have applied the Speech or Debate Clause and its state constitutional equivalents to legislative committees. In *Coffin v. Coffin*, 4 Mass. 1 (1803), Chief Justice Parsons of the Supreme Judicial Court of Massachusetts, considering Massachusetts' equivalent of the Speech or Debate Clause, wrote:

> If a member therefore be out of the chamber, sitting in committee, executing the commission of the house, it appears to me that such member is within the reason of the article, and ought to be considered within the privilege. . . . He ought therefore to be protected from civil or criminal prosecutions for every thing said or done by him in the exercise of his functions, as a representative in committee, either in debating, in assenting to, or in draughting a report.

The Supreme Court has joined in Chief Justice Parsons' reasoning that, in order to effectuate the purposes of the Speech or Debate Clause, the Clause should be extended to protect the committee work of members of Congress. *See, e.g., Kilbourn v. Thompson,* 103 U.S. 168, 26 L.Ed. 377 (1881); *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). In *Gravel v. United States,* 408 U.S. at 606, 624, 92 S.Ct. at 2614, 2626 (1972), the Court held that the conduct of a member of Congress at a committee hearing is protected by the Clause. The court went on to define the types of "legislative acts," including committee acts, which are protected by the Clause: "they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to which the Constitution places within the jurisdiction of either House." *Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627.

*Legislative Status*

Congressman McDade and the Leadership Group rely heavily on a recent case from the Eleventh Circuit, *United States v. Swindall,* 971 F.2d 1531 (11th Cir.1992), to support their argument that legislative status is protected by the Speech or Debate Clause. They argue that because the government has made Mr. McDade's committee status part of the basis of the indictment, an act-based analysis is insufficient.

In *Swindall,* the defendant, a former member of the United States House of Representatives and the House Banking and Judiciary Committees, was convicted of making false material declarations before a grand jury about his knowledge of, and participation in, money laundering activities. In the grand jury phase of the perjury case, the prosecutor questioned the defendant about his knowledge of federal money laundering statutes, prefacing his questions with clauses

---

**2.** I note preliminarily that the underlying conduct alleged in the indictment—Congressman McDade's alleged demands or acceptance of gratuities in return for tacit promises to exercise influence, his alleged actions in attempting to influence the executive branch, and his alleged attempts to help obtain government contracts for his benefactors—is all clearly outside the boundaries which the Supreme Court has established for the Speech or Debate Clause. *See, e.g., Helstoski; Brewster; Johnson.*

such as "being a member of the Banking Committee" and "in your capacity on the Banking Committee." *Swindall,* 971 F.2d at 1539–40. Further, at trial, the district court permitted the government to introduce evidence of the defendant's committee memberships, and also permitted the government to argue to the jury the inference that the defendant had knowledge of the money laundering statutes because testimony was taken concerning those statutes during hearings conducted by the committees on which he served.

On appeal, the Eleventh Circuit reversed three counts of the defendant's nine-count conviction. Summarizing its decision, the court said: "First, our review [3] of Supreme Court precedent convinces us that the privilege protects legislative status as well as legislative acts. Second, here the government's inquiry into Swindall's committee memberships actually amounted to an inquiry into legislative acts." *Id.* at 1543. The court continued, "[i]f the inference is drawn that Swindall acquired knowledge of the statutes *through* his committee memberships, one sees that Swindall could have acquired such knowledge *only* by performing a legislative act such as reading a committee report or talking to a member of his staff." *Id.* (emphasis in original). Close analysis leads me to conclude that the second of the court's alternative holdings, that the government had inquired into the defendant's legislative acts, is the more concise and specific one, and, indeed, the actual basis of the *Swindall* decision. The first holding, that legislative status is protected by the Speech or Debate Clause, is much broader and perhaps unnecessary, given the second holding. That first holding, which expatiates beyond the salient facts of the case and the actual *ratio decidendi,* thus has the ring of dictum.

■ Although written under the rubric of status, *Swindall* turned on a legislative act—

the mental assimilation of information, the thought process involved in a legislator's learning about a particular area of knowledge—in that defendant's case, the techniques, the whys, and the wherefores of money laundering. Although to look at an individual sitting, listening, and absorbing information does not at first blush seem to be an "act," those activities do fall squarely within the definition of "act." [4] Perhaps because of its linguistic first cousin "action," one tends to think of an act in terms of physical movement, the expenditure of physical energy. But using the mind is indeed an act, and when done in the context of one's legislative duties, it is, in fact, a legislative act.

■ Looking at the evidence presented in *Swindall,* one sees that the government's use of the defendant's legislative status in that case is much different from its proposed use in this one. There, the "inference allowed the jury to infer that Swindall performed legislative *acts* to acquire knowledge about the bills." *Id.* at 1546 (emphasis in original). Here, the government is not attempting to prove, either directly, or by implication, inference, or innuendo, any of Congressman McDade's legislative acts. Rather, his legislative status is introduced for its own sake, to show why the alleged bribers and gratuity-givers might have chosen this particular congressman, by demonstrating that, in the real world, legislators are not fungible, co-equal, peas in congressional pod. Some, because of their status, tend to stand out, making them more appealing prospects for would-be illicit pecuniary importuners. The reason for the second *Swindall* holding—that the government attempted to draw inferences about the defendant's legislative acts by showing his legislative status—is missing in this case. Here, the defendant's status is offered to explain the alleged acts of others.

---

3. This court has also conducted a review of Supreme Court precedent, including all of the cases cited in *Swindall.* This review has found no case holding, or even intimating, that legislative status is protected by the Speech or Debate Clause. I am not convinced, as was the Eleventh Circuit, that the Speech or Debate privilege protects legislative status. Indeed, I am persuaded that the

Supreme Court would take the opposite view: that legislative status is *not* protected.

4. For example, the first definition of "act" in the American Heritage Dictionary of the English Language (3d ed. 1992) is "[t]he process of doing or performing something: *the act of thinking.*" (italics in original).

In *Brewster*, the Supreme Court held that the prosecution cannot inquire into a congressman's legislative acts or motivations. In *Swindall*, the court held that the prosecution could not get around the protections afforded legislative acts and motivations by introducing acts through inferences. Here, the government is not attempting to use Mr. McDade's legislative status to inquire into his legislative acts or motivations; rather, it is relying on his status to show the motivations of the alleged bribers and gratuity-givers.

Congressman McDade's and the Leadership Group's argument thus rests on the first holding in *Swindall*: that legislative status itself is protected by the Speech or Debate Clause. As mentioned above, this broad holding was not necessary to resolve the case before the Eleventh Circuit, but to the extent that that court stated that legislative status *qua* legislative status is protected by the Speech or Debate Clause; I am constrained to respectfully disagree.

The *Swindall* court began its discussion of legislative status by pointing out that the Supreme Court has never explicitly distinguished between " 'activity' and 'status.' " *Swindall*, 971 F.2d at 1545. Finding no reason to distinguish between activities and status, the court extracted from the Supreme Court's opinion in *Gravel* three questions which a court should ask when determining whether a matter is protected by the Speech or Debate Clause, and it asked those questions in the context of committee membership: "[D]oes inquiry into a legislator's committee memberships directly impinge on or threaten the legislative process? Does it make legislators accountable before a possibly hostile judiciary? And does it indirectly impair legislative deliberations?" *Swindall*, 971 F.2d at 1545 (citations omitted). The court answered all three questions in the affirmative, thus finding that committee membership is protected by the Speech or Debate Clause. Addressing all three questions together, the *Swindall* court observed that "levying criminal or civil liability on members of Congress for their knowledge of the contents of the bills considered by their committees threatens or impairs the legislative process." *Id.*

However, this observation does not so much support the proposition that legislative status is protected by the Speech or Debate Clause as it does the proposition that the Clause prevents the government from using the committee membership of a member of Congress to prove his or her knowledge of particular legislation, since the act of acquiring such knowledge is a legislative act. I agree that to allow such behavior by the government would be to allow the government to circumvent the Clause, and would give members of Congress an inappropriate disincentive to acquire direct knowledge of bills pending before their committees. However, I do have trouble with extending that proposition to the conclusion reached by the *Swindall* court that legislative status is always protected. Taken to its next logical step, such reasoning would immunize members of Congress from prosecution for crimes such as bribery, extortion, or the acceptance of illegal gratuities, since official status is an element of those crimes, and since the status of a member of Congress could never be proved because of the Speech or Debate Clause. Neither the Framers, nor presumably the Congress which drafted the statutes criminalizing such behavior, could have intended such a result.

If the *Swindall* court truly intended to hold that legislative status itself is protected by the Speech or Debate Clause, it made a substantial departure from the Supreme Court's act-based analysis. The Supreme Court's opinions repeatedly refer to "legislative acts," "legislative motivations," and "legislative activities." I do not see how the ordinary meanings of the terms "act," "motivation," and "activity," terms which conjure up the image of some sort of deliberate behavior, could possibly include "status," which is not behavior at all, but merely a condition or circumstance. In *Gravel*, the Court noted that, since *Kilbourn v. Thompson* in 1881, it had recognized that "a Member's *conduct* at committee hearings . . . may not be made the basis for a civil or criminal judgment against a Member." *Gravel*, 408 U.S. at 624, 92 S.Ct. at 2625 (emphasis supplied). The Court could have, but did not, hold that mere committee membership was protected. The

*Swindall* court reasoned that the Supreme Court had never distinguished between "activity" and "membership" because it had never seen a distinction. But it is the opinion of this writer that the Court has never made such a distinction because it has never been asked to make one, and that if it were asked, it would make the crucial distinction.

Given the act-based analysis applied by the Supreme Court in cases such as *Johnson, Gravel, Brewster,* and *Helstoski,* I believe that the Court would hold that committee membership, and legislative status in general, are not "legislative acts" and that, therefore, legislative status is not protected by the Speech or Debate Clause. Simply put, legislative status and committee membership are not "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627. An indictment's mere mention that the defendant is a high-ranking member of a particular congressional committee, and that those who would corrupt our legislative process might, therefore, view the defendant as a more fertile field in which to seed their money, does not implicate the concerns which the Framers had in mind when drafting the Speech or Debate Clause: separation of powers, the independence of the legislature, and free and open discourse in the Houses of Congress.

 In *Government of Virgin Islands v. Lee,* 775 F.2d 514, 522 (3d Cir.1985), the Third Circuit noted that "the cases interpreting the Speech or Debate Clause in which legislative immunity has been triggered have involved manifestly legislative acts; acts which were so clearly legislative in nature that no further examination had to be made to determine their appropriate status." In that case, the defendant, a Virgin Islands legislator, argued that his conversations and meetings with other officials were protected by the Virgin Islands' version of the Speech or Debate Clause. Applying the same act-based analysis which is applicable to the Speech or Debate Clause of the United States Constitution, the Third Circuit held that "[i]t is the content of Lee's private conversations, and not the mere fact that the conversations took place, that determines whether Lee is entitled to legislative immunity." *Lee,* 775 F.2d at 522. Likewise, here it is the content—the quality and character—of Congressman McDade's acts, and not the mere fact that he is a member of Congress, that determines whether he is entitled to legislative immunity. Indeed, in *Helstoski,* the Supreme Court took the act-based analysis so far as to suggest that specific conversations could be divided into protected and unprotected parts, with the protected parts, "references to legislative acts," excised so that the remainder of the conversations could be admitted into evidence. *Helstoski,* 442 U.S. at 488, n. 7, 99 S.Ct. at 2439, n. 7. These cases clearly require this court to take an act-based approach when analyzing the Speech or Debate Clause. Having taken such an approach, I find that the Clause does not protect legislative status.

*The Congressional and Committee Processes*

 Congressman McDade and the Leadership Group also advance the argument that the congressional committee process itself is protected by the Speech or Debate Clause. They argue that, in order to show that Mr. McDade wielded extra power because of his status as the ranking minority member on two committees, the government will have to introduce evidence of how congressional committees function, which evidence is protected by the Clause. The government denies that it intends to introduce such evidence, but it also takes issue with the suggestion that that evidence would be protected by the Speech or Debate Clause. Congressman McDade and the Leadership Group further argue that, in his defense, Mr. McDade will have to show that even if the alleged bribers and gratuity-givers believed that he exercised extra influence, those beliefs were unreasonable. To do this, the argument goes, he will have to introduce evidence of the committee process, his roles on the two committees, and his legislative

acts, which evidence is protected by the Speech or Debate Clause.

 Neither Mr. McDade nor the Leadership Group cites a single case for the proposition that the Speech or Debate Clause prohibits the prosecution or the defense from telling a jury generally about the congressional process. Indeed, in *Swindall,* the district court issued a pretrial order which allowed the defendant to call Representative Barney Frank to testify about the number of bills before the defendant's committees, and to "argue that it is not reasonable to infer that a congressman is intimately aware of every bill before his committee." *Swindall,* 971 F.2d 1531.[5] Likewise, Representative McDade will be able to call witnesses to testify that his committee positions did not give him extraordinary influence. I see no reason why the Speech or Debate Clause would be violated by allowing the defendant to call a witness to give the jury an introduction to the functioning of congressional committees. The testimony would be along the lines of "this is how Congress works" or "this is how committees work" in general, rather than "this is what Congressman McDade did to get this particular bill passed" or "this is what Congressman McDade often does to influence the votes of other members of Congress." Indeed, if the hearsay hurdle could be overcome, this testimony could just as well be given by a high school civics teacher. General educational or background evidence which the defendant himself presents to the jury to place the government's evidence in context cannot be considered to violate the Speech or Debate Clause. It would not be evidence of a legislative act of the defendant, nor would it be introduced "against" him. And Mr. McDade would not be being "questioned in any other Place," to use the words of the Clause, since he would be introducing the evidence himself.

The government is not forcing Congressman McDade to waive his legislative privilege or introduce evidence of his legislative acts in this case. As mentioned above, I do not believe that general background evidence or educational instruction about how congressional committees work is evidence of legislative acts; thus, Mr. McDade can introduce such evidence without having to waive his legislative privilege at all. But if he wishes to go even further, partially waiving his privilege in order to impugn the reasonableness of the other alleged wrongdoers' beliefs by introducing evidence of his legislative acts, he may do so. As Chief Justice Parsons said of the Massachusetts version of the Speech or Debate Clause, "it appears to me that the privilege secured by it is not so much the privilege of the house as an organized body, as of each individual member composing it, who is entitled to this privilege, even against the declared will of the house." *Coffin v. Coffin,* 4 Mass. 1 (1803). Just as a member of Congress is entitled to the privilege against the will of the entire House, he or she would also seem to be entitled to waive that privilege. Unlike *Swindall,* here the government's case, both in its proffered evidence and argument, does not itself violate the Clause, since it does not invite the jury to consider, or even infer, any legislative acts. Nor does it present the defendant with an irreconcilable dilemma, or even worse, a Hobson's Choice,[6] over whether to waive his legislative privilege.

*Evidentiary Hearing*

 Congressman McDade also argues that, in the event the court does not dismiss the indictment as violative of the Speech or Debate Clause, the court should hold a pretrial evidentiary hearing and require the government to make an offer of proof regarding any allegations as to which there is some question as to the applicability of the Speech or Debate Clause. In support of this position, Mr. McDade points to three documents used by the government at the grand jury proceeding which he claims are

---

5. The district court later struck Representative Frank's testimony because it had gone further than the pretrial order had allowed, and because the government threatened to introduce evidence which would violate the Speech or Debate Clause in order to impeach Representative Frank's testimony.

6. *See, Valenti v. Mitchell,* 790 F.Supp. 534, 548 (E.D.Pa.1992), *aff'd in part,* 962 F.2d 288 (3d Cir.1992).

protected documents, and he then argues, in effect, that if there are three, then there must be more. Two of the documents relate to travel reimbursement, and the other is a draft memorandum relating to Grumman's attainment of a government contract. Mr. McDade alleges that the third document was directed to the Small Business Committee. I find that the government did not violate the Speech or Debate Clause by introducing these documents at the grand jury proceeding, since none of them relate to legislative acts.

■ Mr. McDade also argues that the special First Amendment and Speech or Debate Clause concerns which permeate this case should cause the court to hear all of the government's evidence before deciding whether the case should go to trial. Because I do not find that any of the allegations in the indictment carries with it an inevitability, or even a high probability, of violating the Speech or Debate Clause, and because I find no support for the proposition that the government should have to prove its case and proffer all its evidence in the pretrial stage, I shall not order an evidentiary hearing. If questions of admissibility on Speech or Debate grounds arise during trial, Mr. McDade may make objections. Those objections, like all other objections at trial, will be ruled upon consistent with relevant Supreme Court and Third Circuit precedent, and with this Opinion. But I do not find that this indictment raises such grave constitutional concerns as to warrant the taking of such extraordinary steps as pretrial evidentiary hearings or offers of proof.[7]

*Conclusion*

■ The Speech or Debate Clause was not intended to immunize members of Congress from criminal or civil prosecution merely because of their status. The Clause was intended to protect the legislative acts of members of Congress in order to preserve legislative independence and to encourage

vigorous legislative debate, not "to make Members of Congress super-citizens, immune from criminal responsibility." *Brewster,* 408 U.S. at 516, 92 S.Ct. at 2539. Simply being a member of Congress or a committee member is not a legislative act. As the Supreme Court said in *Brewster,* "the shield does not extend beyond what is necessary to preserve the integrity of the legislative process." *Id.* at 517, 92 S.Ct. at 2540. Extending the protection of the Speech or Debate Clause to legislative status would do nothing to help preserve the integrity of the legislative process. If anything, it would adversely affect the public perception of legislative integrity by creating the impression that members of Congress are immune from prosecution merely because they are members of Congress. Surely, the Framers did not intend such a result.

## ACCEPTANCE OF ILLEGAL GRATUITIES

■ Counts Two and Four of the indictment charge Congressman McDade with violating 18 U.S.C. § 201(c)(1)(B), Acceptance of an Illegal Gratuity by a Public Official. That statute holds criminally liable:

> Whoever—(1) otherwise than as provided by law for the proper discharge of official duty— ... (B) being a public official ..., directly or indirectly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of any official act performed or to be performed by such official.

18 U.S.C. § 201(c). Counts One and Three, the conspiracy counts, and Count Five, the RICO count, include violations of § 201(c)(1)(B) as overt or predicate acts. Mr. McDade moves to dismiss Counts Two and Four in their entirety and those allegations in Counts One, Three, and Five which rely upon his alleged violations of § 201(c)(1)(B), on the ground that the indict-

---

**7.** I also hold that Mr. McDade's right under *Helstoski* to an interlocutory appeal of this decision does not carry with it the right to a fully developed factual record. An interlocutory appeal is exactly that—an *interlocutory* appeal. The purpose of the interlocutory appeal is to determine whether Mr. McDade' rights under the Speech or Debate Clause are violated by this indictment. Mr. McDade does not have a pretrial right to have the appellate courts rule on all the evidentiary questions which may arise during trial.

ment fails to adequately plead the elements of the offense of accepting illegal gratuities.

*Quid Pro Quo*

Congressman McDade's first argument is that the indictment fails to plead that he took or promised to take a specific action for each gratuity he allegedly accepted or demanded. The statute itself does not include a quid pro quo requirement, but Mr. McDade asks the court to read such a requirement into the statute, as the Supreme Court did in construing the Hobbs Act in *McCormick v. United States*, 500 U.S. ——, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991). In that case, the Supreme Court held that an elected official could not be prosecuted for extortion for accepting campaign contributions unless "the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *McCormick*, 500 U.S. at ——, 111 S.Ct. at 1816, 114 L.Ed.2d at 326.

Any comparison of *McCormick* to the case at bar must, of course, start with the obvious observation that *McCormick* was a Hobbs Act case, while the current argument is about the gratuities statute. It is thus doubtful whether *McCormick* controls at all.

But even if *McCormick* did apply to the gratuities statute, I do not believe it would require the government to plead a quid pro quo in this case. To begin with, the *McCormick* court explicitly did not decide whether its reasoning should carry beyond the campaign contributions context. The court said, "we do not decide whether a quid pro quo requirement exists in other contexts, such as when an elected official receives gifts, meals, travel expenses, or other items of value." *Id.* 500 U.S. at ——, n. 10, 111 S.Ct. at 1817, n. 10, 114 L.Ed.2d at 326, n. 10. The *McCormick* opinion concentrated not on the Hobbs Act itself, but on the character of campaign contributions and the appropriateness of using them in a Hobbs Act indictment, further indicating that the Supreme Court's holding was a very narrow one, applicable only to campaign contributions, which have historically been given special First Amendment status. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The Court explained that it would make no sense "to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries," since such conduct "has long been thought to be well within the law" and "in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures." *Id.* 500 U.S. at ——, 111 S.Ct. at 1823, 114 L.Ed.2d at 325–26.

Given the language of the Supreme Court's opinion, I find that *McCormick* does not require a quid pro quo for extortion outside the context of campaign contributions. *Accord, United States v. Davis*, 967 F.2d 516 (11th Cir.1992); *United States v. Torcasio*, 959 F.2d 503 (4th Cir.1992). In this case, the government does not charge Congressman McDade with accepting campaign contributions as gratuities. Rather, the charges are that he accepted gifts such as cash, meals, travel expenses, vacations, golf equipment, and tickets to sporting events, knowing that those gifts were given with the expectation that he would use his Congressional influence in ways favorable to his patrons. This indictment does not threaten to convict Mr. McDade of engaging in legitimate political activity. These alleged acts are certainly not the type of historically elevated First Amendment behavior discussed in *McCormick* and *Buckley*.[8]

---

8. In *Evans v. United States*, 504 U.S. ——, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), the Supreme Court held that the government satisfied the quid pro quo requirement of *McCormick* where it had alleged that the defendant received a payment in return for a promise to perform specific official acts. *Evans*, 504 U.S. at ——, 112 S.Ct. at 1889, 119 L.Ed.2d at 72. The defendant in *Evans* had argued that the district court's jury instructions did not "properly describe the quid pro quo requirement for conviction *if the jury found that the payment was a campaign contribution.*" *Id.* (emphasis supplied). Since *Evans*, like *McCormick*, was a campaign contributions case, it did not go beyond the explicit limitation of the Supreme Court's holding in *McCormick*.

I recognize that Justice Kennedy, in concurrence, and Justices Thomas and Scalia and Chief Justice Rehnquist, in dissent, suggested that the

■ Obviously, having found no quid pro quo requirement for non-campaign contributions under the Hobbs Act, I also do not find such a requirement under the gratuities statute. The Third Circuit has held:

> we find it unnecessary for the Government to allege in an indictment charging a § 201(g) [reenacted as § 201(c)(1) ] offense that a gratuity received by a public official was, in any way, generated by some specific, identifiable act performed or to be performed by the official. A quid pro quo is simply foreign to the elements of a subsection (g) offense. What is proscribed, simply put, is a public official's receipt of a gratuity, to which he was not legally entitled, given to him in the course of his everyday duties, for or because of any official act performed or to be performed by such public official, and he was in a position to use his authority in a manner which could affect the gift-giver.

*United States v. Niederberger,* 580 F.2d 63, 68–69 (3d Cir.1978). The indictment in this case charges exactly the kind of behavior described by the *Niederberger* court. *McCormick* does not add an element to the gratuities statute, nor does it reverse Third Circuit precedent on that statute. There is no quid pro quo requirement.

*House Ethics Rules*

■ Congressman McDade's next argument is that the indictment fails to allege that his conduct was "otherwise than as provided by law for the proper discharge of official duty." More specifically, he argues that much of the conduct alleged in the indictment complied with the Rules of the House of Representatives, namely Rule XLII, the Code of Official Conduct, and Rule XLVII, Limitations on Outside Earned Income. The House Leadership Group joins Mr. McDade in arguing that the House Rules should be treated as "laws," at least within the confines of the gratuities statute. The Leadership Group refers to the Ethics in Government Act of 1989, 5 U.S.C. § 7353, which was intended to bar prosecution of government officials under the gratuities statute for their acceptance of gifts of minimal value, where the gifts were authorized by the ethics office of the appropriate branch of government.

The government's response is threefold: first, that the Ethics in Government Act was enacted after all of the conduct alleged in the indictment; second, that none of the conduct alleged in the indictment is validated by the House Ethics Rules or the Ethics in Government Act; and third, that the House Ethics rules are not "laws" since they were not passed by both houses of Congress and signed by the President. As to the government's first response, Mr. McDade and the Leadership Group counter in two ways: (1) when Congress changes its mind as to whether conduct is prosecutable, prior conduct that might have been prosecutable at the time of its commission cannot be prosecuted after Congress has decided that that conduct is no longer prosecutable, under the general criminal law doctrine of abatement, and (2) when enacting the Ethics in Government Act, Congress was merely reaffirming its prior intent that conduct such as this was not to be prosecuted under the gratuities statute.

■ First, I find it irrefutable that the House Ethics Rules cannot be given the status of "laws." In our country, a bill, in order to become a law, must be passed by both houses of Congress and be signed by the President.[9] The gratuities statute has undergone this rigorous procedure and has become law. The House Ethics Rules have not. The gratuities statute prohibits public officials, including Members of Congress, from accepting gifts "otherwise than as pro-

---

Court had extended the quid pro quo requirement to all prosecutions under § 1951 of the Hobbs Act. But since I can find no language in the Opinion of the Court in *Evans* which explicitly extends the quid pro quo requirement, and since the facts of *Evans* did not require the Court to extend *McCormick,* I respectfully do not interpret the Court's opinion so broadly as did those concurring and dissenting Justices.

9. If the President chooses to veto the bill, his veto may, of course, be overridden by a two-thirds majority vote in both houses of Congress. Alternatively, a bill will become law if the President takes no action for ten days.

vided by law." That constitutionally enacted statute cannot be altered or undercut by the unilateral action of the House of Representatives. In essence, Mr. McDade and the Leadership Group argue that the House has the power to make unilateral decisions exempting its Members from criminal liability simply by passing resolutions to that effect. I respectfully disagree. If the House wishes to exempt certain conduct of its Members from prosecution under the gratuities statute, nullifying that law as to them, it can pass a bill to that effect and send it on to the Senate and the President. It is a statutory truth that Congress well knows how to exempt itself from legislation: by statute. *See, e.g.,* Civil Rights Act of 1991, Title VII, 42 U.S.C. § 2000e(b); Occupational Safety and Health Act of 1970, 29 U.S.C. § 652(5); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b). But short of that, members of the House of Representatives are subject to prosecution for accepting illegal gratuities under the same rules as are other public officials.

■ The Ethics in Government Act of 1989 was enacted to limit the liability of public officials under the gratuities statute by permitting the ethics offices in each branch of government to establish rules for the acceptance of gifts. Subsection (b)(2) of the Act states: "(A) Subject to subparagraph (B), a Member, officer, or employee may accept a gift pursuant to rules or regulations established by such individual's supervising ethics office.... (B) No gift may be accepted pursuant to subparagraph (A) in return for being influenced in the performance of any official act." 5 U.S.C. § 7353(b)(2). This language makes it clear that, regardless of any rules passed by any ethics office, no public official may accept a thing of value in

return for being influenced in the performance of his or her official duties. In this case, the indictment charges Congressman McDade with accepting things of value in return for being influenced in the performance of his official acts.[10] Whether Mr. McDade's conduct was within the House Ethics Rules does not matter, except perhaps to show his state of mind while he was committing the alleged acts, because the Ethics in Government Act does not authorize the House to authorize conduct such as that charged in this indictment.[11]

*Things of Value*

■ Congressman McDade argues that the indictment does not adequately allege that he accepted "things of value." He argues that many of the gifts, such as a golf jacket, a golf bag, and a golf umbrella, were *de minimis*. In addition, he argues that many of the travel expenses he allegedly received were reimbursable by the government. Since he would not have paid for the trips anyway, the argument goes, the trips had no value to him. Mr. McDade does not cite any authority for these specific propositions, but he does cite *United States v. Gorman,* 807 F.2d 1299 (6th Cir.1986), for the proposition that the statute's reference to "anything of value" should be construed as referring not to nominal value, but to "substantial value." However, I can find no intimation in *Gorman* that "value" means "substantial value." In *Gorman,* the court found that the gratuities accepted by the defendant had both an objective and a subjective value to him. The facts of that case revealed a defendant who had received substantial value from the gifts, but the court did not hold that items of lesser value would not have qualified

---

**10.** I note that there is a difference between "legislative acts," which I have held that the indictment does not reach, and "official acts." While the term "legislative act" includes only those acts which are an integral part of the process by which members of Congress consider, pass, and reject proposed legislation, the term "official act" is much broader, applying to almost anything a public official does in his capacity as a public official. For example, interacting with, or attempting to exercise influence over, an executive branch department, is an "official act," and a member of Congress may be prosecuted and

convicted under the gratuities statute if he or she accepts gifts in return for taking such action. That action, however, is not a "legislative act" within the protection of the Speech or Debate Clause. *See, e.g., Johnson; Brewster; Gravel.*

**11.** I decline to decide whether conduct undertaken prior to 1989 was authorized *post hoc,* i.e. made unprosecutable, by the Ethics in Government Act, since I find that the Act, even if applicable to pre–1989 conduct, does not authorize the conduct charged here.

for prosecution under the gratuities statute. In fact, the court said that "the focus of the above term ['thing of value'] is to be placed on the value which the defendant subjectively attaches to the items received." *Gorman*, 807 F.2d at 1305 (citing *United States v. Williams*, 705 F.2d 603, 623 (2d Cir.1983), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983)).

In *Williams*, the defendant was charged under the gratuities statute for receiving some stock which turned out to have no commercial value. The Second Circuit upheld the district judge's instructions to the jury that "stock could be a thing of value 'if, regardless of its actual worth in the commercial world, you find that the defendant believed that the stock had value for himself'" *Williams*, 705 F.2d at 623. The court noted that the purpose of the bribery and gratuities statutes is to punish misuse of public office, and that the term "thing of value" has been broadly construed to effect that purpose. *Id.*

 Here, the government has not assigned monetary values to most of the gifts allegedly accepted by Mr. McDade. However, even the smallest of those items—the golf bag, the golf umbrella, and the golf jacket—are valuable enough, even objectively, to be prosecuted under the gratuities statute. And, of course, these items may have had additional subjective value to Mr. McDade.[12] As for the purportedly reimbursable travel expenses, it does not matter whether those expenses were reimbursable or not.[13] What matters is Mr. McDade's method of obtaining them. The government alleges that he obtained the trips in illegal ways and from illegal sources. The purpose of the gratuities statute is to punish official misconduct, and the acceptance of gifts in return for a promise, overt or tacit, to exercise influence, is punishable by the statute. That is what

the government alleges Mr. McDade did here. Whether or not he could have obtained the same or similar items legally is of no moment.

### *"Personally"*

 Finally, Mr. McDade argues that the government has failed to allege in the indictment that he accepted some of the alleged gratuities "personally," as the statute requires. Specifically, Mr. McDade points to alleged contributions to his campaign and to the scholarship which his son allegedly received. But fairly examined, the indictment's gratuities counts do not charge Mr. McDade with accepting campaign contributions. Rather, it alleges that Mr. McDade accepted "sham campaign contributions." In other words, the government alleges that these payments were not campaign contributions at all, and that, in reality, Mr. McDade planned to use these funds for his own benefit, rather than for the benefit of his campaign. Thus, he received the contributions "personally."

 As for the alleged scholarship, Mr. McDade points out that the government charges that it was provided to his son, not to him. The government argues that the evidence will show that Mr. McDade benefitted personally from the scholarship. During the time in question, the domestic relations law of Pennsylvania was that a parent has a support obligation to pay for the college education of his or her children, as long as payment of the child's college expenses would not result in undue hardship to the parent. *See, e.g.*, *Leonard v. Leonard*, 353 Pa.Super. 604, 510 A.2d 827 (1986); *Lederer v. Lederer*, 291 Pa.Super. 22, 435 A.2d 199 (1981). At the time of the alleged scholarship payment here, this doctrine was considered to be good law in Pennsylvania.[14]

---

**12.** For example, the golf jacket was a green "Masters" jacket similar to the one awarded each year to the champion of the Masters golf tournament in Augusta, Georgia. The green jacket is one of the most recognizable and hallowed items of clothing in the world of sports, presumptive covetable by a golf buff—although, concededly, the jacket without the Masters victory is something of an empty vestment.

**13.** The government argues that many of the travel expenses were, in fact, not reimbursable by the House of Representatives, and that Mr. McDade's alleged trips were of a different cost, style, and convenience from those which he might have received had he gone through proper channels, e.g. trips on Lear jets and accommodations at expensive resorts.

**14.** In *Blue v. Blue*, 532 Pa. 521, 528, 616 A.2d 628, 632 (1992), the Pennsylvania Supreme court

Therefore, it follows that, at the time at issue here, the payment of scholarship money to a child bestowed a personal benefit on the scholarship recipient's parents, since the parents were relieved, at least partially, of their duty to pay for the child's education.

■ I realize, however, that the word "personally" in the statute seems to imply some sort of direct, rather than indirect, benefit to the charged official. The question of whether Mr. McDade benefitted personally from the scholarship payments to his son is one which should be resolved by a jury, rather than by the court in a pretrial motion. The government has alleged that Mr. McDade received some sort of personal benefit from the scholarship. It will be up to the jury to determine whether he actually did.

### Conclusion

Mr. McDade's assertions notwithstanding, this court cannot require the government to plead its case with more specificity merely because the defendant is a United States Congressman or because the First Amendment and the Speech or Debate Clause may arguably be implicated in this case. I must treat this indictment in the same way as I would treat any other. Because I find that in all counts of the indictment the government has adequately pled each of the elements of the offense of Acceptance of Illegal Gratuities by a Public Official, I shall not dismiss any of the counts.

## CONSPIRACY

### Motion to Dismiss

■ Counts One and Three of the indictment charge Congressman McDade with conspiracy to violate the gratuities statute and to defraud the United States of his honest,

loyal, and faithful service in his official capacity, under 18 U.S.C. § 371.[15] Since I have found that the government has adequately pled violations of the gratuities statute (*see supra*, at 1170–1175), I must reject Mr. McDade's argument that the conspiracy counts should be dismissed for failure to adequately plead the elements of the underlying offense.[16]

■ Mr. McDade also argues that the government has not adequately pled a conspiracy to defraud the United States because (1) the indictment does not charge him with doing anything unlawful, but merely with doing his job, and (2) to prove his honesty, loyalty, or faithfulness would require inquiry into his legislative motivations, which inquiry would violate the Speech or Debate Clause. In *United States v. Johnson*, 383 U.S. at 169, 172, 86 S.Ct. at 749, 751 (1966), the Supreme Court wrote: "18 USC § 371 has long been held to encompass not only conspiracies that might involve loss of government funds, but also 'any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government.'" (quoting *Haas v. Henkel*, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569 (1910).) Here, the government has charged Mr. McDade with conspiring to defraud the United States of his honest, loyal, and faithful service as a United States Congressman. The indictment against Mr. McDade clearly alleges an impairment, obstruction, or defeat of the lawful function of Congress. These allegations go well beyond a Congressman's merely doing his job. The acceptance of illegal gratuities is not, of course, part of a Congressman's job. If proved, it is unlawful behavior which would defraud the United States in violation of § 371.

---

observed that, in each of the cases cited above, "the Superior Court assumed that a legal obligation existed." In *Blue*, the court overruled those cases, holding that "a parental duty of support is owed until a child reaches 18 or graduates from high school, whichever event occurs later." *Blue*, 532 Pa. at 529, 616 A.2d at 633.

15. That section holds criminally liable persons who "conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner

or for any purpose, [where] one or more of such persons do any act to effect the object of the conspiracy, ...." 18 U.S.C. § 371.

16. At oral argument, Mr. McDade's counsel also argued that the government had mischaracterized some of Mr. McDade's legitimate and lawful actions as violations of the gratuities statute. Whether the government's or Mr. McDade's interpretation of those actions is correct is a question for the jury, not for the court on a motion to dismiss, where the question is whether the indictment adequately *alleges* a crime.

█ Further, as discussed above (*see supra*, at 1162–1170), the government, in order to prove its case, will not have to introduce evidence that would violate the Speech or Debate Clause. The receipt of bribes and gratuities and the exercise of influence over executive branch departments and agencies is not protected by the Speech or Debate Clause. It is through evidence of acts such as these that the government will attempt to prove that Mr. McDade was dishonest, disloyal, or unfaithful. Proof of Mr. McDade's alleged fraud on the public trust will not require inquiry into his legislative acts, since the fraud is in his alleged acceptance of illegal gratuities and his alleged attempts to influence the functions of the executive branch, which are not legislative acts.

Because I find that the government has adequately pled the elements of the offense of conspiracy, as well as the elements of the underlying offenses contained within the conspiracy counts, and because proof of these offenses will not require the government to violate Mr. McDade's rights under the Speech or Debate Clause, I shall not dismiss Counts One and Three.

*Motion for Pretrial Disclosure of Co–Conspirators' Statements and Pretrial Proof of the Defendant's Connection to the Conspiracies*

█ Congressman McDade argues that he is entitled to pretrial disclosure of the statements of his alleged co-conspirators and to have the government prove, before trial, his connection to the conspiracies. Mr. McDade argues that, if the government fails at trial to connect him adequately to the alleged conspiracies, and the court therefore dismisses the conspiracy counts at the close of the government's case, he will be prejudiced by the fact that the jury will have heard, *inter alia*, allegations of massive government defense-procurement fraud. Mr. McDade speculates that the vast majority of

the government's evidence will pertain to the two alleged conspiracies. Consequently, he argues, even if the court were to dismiss the conspiracy counts at the close of the government's case, the jury will have been inundated with evidence of the alleged conspiracies and will be unable to distinguish the evidence that is relevant to the gratuities and RICO counts from the irrelevant conspiracy evidence. In other words, Mr. McDade argues that the whole trial would be tainted with evidence of unproved conspiracies, and that the jury might convict him of the other charges on the basis of his relationships with some of the government's "undesirable" witnesses.

While it is true that the government must prove the admissibility of co-conspirators' statements before those statements are admitted into evidence under Federal Rule of Evidence 801(d)(2)(E),[17] this court has found no authority for the proposition that such proof must be made before trial. Proof of admissibility is usually introduced during trial, either through the testimony of other witnesses, or contemporaneously with the offering into evidence of the co-conspirator's statement.[18] In fact, in *United States v. Continental Group, Inc.*, 603 F.2d 444 (3d Cir.1979), the Third Circuit upheld the district court's decision to admit co-conspirators' statements subject to the government's *later* establishment of the existence of the conspiracy. Although the court considered "the danger of prejudice to the defendant inherent in the practice of admitting coconspirator declarations, otherwise hearsay, subject to later proof of the requisite conspiracy," it held that the district court's approach was reasonable. *Continental Group*, 603 F.2d at 457. The Third Circuit reaffirmed the validity of admitting co-conspirators' statements subject to later connection in *United States v. Gambino*, 926 F.2d 1355, 1361 (3d Cir. 1991), where "the conspiracy became clearly

---

**17.** *See, e.g., Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

**18.** In *United States v. McGlory*, 968 F.2d 309, 333 (3d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 415, 121 L.Ed.2d 339 (1992), the Third Circuit listed the four factors which the government must establish in order to have co-conspir-

ators' hearsay statements admitted into evidence: (1) that a conspiracy existed, (2) that the party and the declarant against whom the statement is offered were both members of the conspiracy, (3) that the statement was made in the course of the conspiracy, and (4) that the statement was made in furtherance of the conspiracy.

defined only after the testimony of several witnesses."

In this case, Mr. McDade speculates that the government will attempt to introduce co-conspirators' statements subject to later connection. However, the record does not establish whether the government does in fact intend to proceed this way. In *Continental Group* and *Gambino*, the Third Circuit recognized that "the control of the order of proof at trial is a matter committed to the discretion of the trial judge." *Continental Group*, 603 F.2d at 456; *Gambino*, 926 F.2d at 1360. If, at trial, the government attempts to offer the statements of co-conspirators subject to later connection, I will make a ruling upon the full record as it has been developed at that time, but I see no reason to force the government to call its witnesses in for a pretrial evidentiary hearing to prove its conspiracy case in advance. Indeed, I can see a number of obvious reasons why that should not be done, and that precedent not be set.

In *United States v. Ammar*, 714 F.2d 238 (3d Cir.1983), the defendants appealed the trial court's refusal to conduct a preliminary hearing to determine the admissibility of co-conspirators' statements. The Third Circuit affirmed the district court's decision, finding that the district court did not err or abuse its discretion in refusing to hold a hearing.

None of the cases cited in Mr. McDade's brief require a pretrial hearing to establish the existence of a conspiracy. Some Courts of Appeal have held that it is preferable for the district court to require the government to introduce all its non-hearsay evidence first, rather than admitting co-conspirators' statements subject to later connection.[19] Indeed, the Third Circuit has counseled that "the practice of admitting co-conspirator hearsay statements subject to later connection 'be carefully considered and sparingly utilized by the district courts.'" *Gambino*, 926 F.2d at 1360 (quoting *Continental Group*, 603 F.2d at 457). Most assuredly, I will give careful consideration to the circuit courts' preferences if I am confronted with that question at trial. But none of those courts required, or even stated a preference for, pre-*trial* proof of conspiracies, as opposed to pre-admission-of-hearsay proof *at* trial.

I agree with Mr. McDade that this case is complex and that it may present some difficult evidentiary questions. But these questions would be no easier to answer in a pretrial hearing than they would be at trial. At oral argument, the government asserted that it will not require a large number of witnesses to establish the existence of the alleged conspiracies and Mr. McDade's participation in them. Given this fact, and the prejudice that the government would suffer from having to disclose its conspiracy case before trial, as well as the inconvenience and cost of holding a pretrial mini-trial, I shall not order an evidentiary hearing.[20] Mr. McDade may object to the government's introduction of co-conspirators' statements at trial, and I will decide at that time, with the benefit of the record already developed, whether or not to allow the government to introduce those statements subject to later connection. But I do not find this case to be so unusual, nor the danger of prejudice to the defendant so great, as to require a pre-

19. *See, e.g., United States v. Behrens*, 689 F.2d 154 (10th Cir.1982), *cert. denied*, 459 U.S. 1088, 103 S.Ct. 573, 74 L.Ed.2d 934 (1982); *United States v. Vinson*, 606 F.2d 149 (6th Cir.1979), ·*cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); *United States v. James*, 590 F.2d 575 (5th Cir.1979) (*en banc*); *United States v. Macklin*, 573 F.2d 1046 (8th Cir.1978), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978); *United States v. Petrozziello*, 548 F.2d 20 (1st Cir.1977).

20. In *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 260 (3d Cir.1983), *rev'd* on other grounds sub nom. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Third Circuit held that the district court had the discretion to order pretrial offers of proof, hearings, and argument because, in that case, the district court had determined that such treatment would be more efficient and could lead to more informed decisions, although the Third Circuit noted that a drawback of making pretrial determinations is that those decisions would be made "without the benefit of the flavor of the record developed at trial."

trial mini-trial on the conspiracy counts.[21]

*Motion for Pretrial Standing under Title III to Obtain, and Object to the Admission of, Wiretap Evidence*

■■■ Congressman McDade moves the court to declare that he has standing to object to the admission of wiretap evidence at trial. Congress addressed the issue of wiretaps in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. Section 2518(10)(a) reads in relevant part, "Any aggrieved person in any trial, hearing, or proceeding before any court . . ., may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom." Mr. McDade argues that he is an "aggrieved person" within the meaning of the statute. Section 2510(11) defines that term: " 'aggrieved person' means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." Mr. McDade advances the "target standing" theory in support of his argument, arguing that, when a wiretap is directed at certain members of a conspiracy in an attempt to discover evidence of the conspiracy, it is "directed" at all the alleged members of the conspiracy.

Mr. McDade invites the court's attention to the Senate Report which accompanied Title III. That report states that the definition of "aggrieved person" "is intended to reflect existing law." S.Rep. No. 1097, 90th Cong., 2d Sess. 66 (1968), 1968 U.S.C.C.A.N. 2112, 2179–80. The report then cites three Supreme Court cases, including *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), and invites the reader to "see" a Second Circuit case on which certiorari had

been granted, *United States ex rel. DeForte v. Mancusi,* 379 F.2d 897 (2d Cir.1967). The Supreme Court later affirmed the Second Circuit's decision in *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). In *Jones,* the Supreme Court held that "anyone legitimately on the premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him." *Jones,* 362 U.S. at 267, 80 S.Ct. at 734. In *Mancusi,* the Second Circuit held that a search which the state claimed was "directed" against a local union was actually directed at the defendant, a union official, since the ultimate goal of the state in conducting the search was to uncover evidence of the suspected illegal activities of some union officials. The Supreme Court affirmed the Second Circuit's ruling that the defendant had a reasonable expectation of privacy in the union offices, but did not address the issue of whether the search was "directed" at him.

According to Mr. McDade, the logical extension of *Jones* and *Mancusi,* which Congress intended to embody in Title III, is that a search directed at a conspiracy is directed at all the members of the conspiracy. The government points out that the Supreme Court explicitly rejected the target standing theory in the Fourth Amendment context in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). There, the Court held that *Jones* had not recognized target standing, but rather that *Jones* "merely stands for the proposition that a person can have a reasonable expectation of privacy in a place other than his own home." *Rakas,* 439 U.S. at 142, 99 S.Ct. at 430. Thus, the Court

---

**21.** Mr. McDade invites the court's attention to *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and *United States v. Bertolotti,* 529 F.2d 149 (2d Cir.1975). In those cases, multiple defendants were tried together and convicted of conspiracy. Their convictions were reversed because, in the indictments, the government had alleged a single conspiracy of which all the defendants were a part, but at trial the evidence proved multiple conspiracies, some of which did not involve all the defendants. Each individual defendant was prejudiced by the introduction into evidence of the conspiratorial and other criminal activities of his co-defendants, since many of those activities had nothing to do

with the whether each individual defendant was, or was not, guilty.

I recognize that that is always a concern in a conspiracy prosecution, and counsel have my assurance that I shall entertain and sustain timely objections to unfairly prejudicial and irrelevant testimony. But contrary to Mr. McDade's assertion, it does not strike this court as the paradigm of judicial economy to make such determinations before trial. I prefer to confront these issues during the actual testimony at trial, so that I can make the rulings in the context of some evidentiary meat on what are now the comparatively bare bones of the government's allegata.

held, the Fourth Amendment does not, and never did, include the concept of target standing.

Just this week, the Supreme Court unanimously reaffirmed *Rakas* in no uncertain terms, and rejected the argument that there is a co-conspirator exception to the standing rules. In *United States v. Padilla,* —— U.S. ——, 113 S.Ct. 1936, 123 L.Ed.2d 635 (U.S. 1993) (*per curiam*), the Court held that, for Fourth Amendment analysis, participation in a criminal conspiracy neither adds nor detracts from a defendant's reasonable expectation of privacy.

Mr. McDade argues that since Title III predates *Rakas,* that case cannot be used to determine what was "existing law" at the time of Title III's enactment, and that Congress's citation to *Jones* and *Mancusi* indicates that it intended to include target standing in Title III. Whether or not the actual holding of *Rakas* applies to Title III, I agree with the Court's observation that *Jones* did not adopt a theory of standing as broad as that now advanced by Mr. McDade. In fact, even the *Mancusi* court did not envision such a broad definition of standing. Unlike *Mancusi,* in this case the government named specific targets in the wiretap authorization orders signed by the court, and Mr. McDade was not one of the named targets. Furthermore, Mr. McDade's voice was not recorded on a single one of the recorded conversations. By contrast, in *Mancusi,* the defendant's union offices, which he and other officials shared, were searched, and the defendant had personally prepared many of the documents which were seized. I do not believe that the *Mancusi* court would have extended standing to a defendant who wished to challenge the admission of a document which he had not prepared and which was seized in the office of an organization at which he was not employed. This hypothetical, rather than the actual facts of *Mancusi,* is analogous to Mr. McDade's situation, in which he wishes to challenge the validity of wiretaps of phone calls to which he was not a party, and which

were not even made from phones to which he had access.

Also, in *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the Supreme Court mentioned Title III in a footnote during its discussion of "existing standing rules." In that case, the Court held that "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman,* 394 U.S. at 171–72, 89 S.Ct. at 965–66. In the footnote, the Court noted that, when drafting Title III, Congress could have extended the definition of "aggrieved person" beyond the existing law outlined in *Alderman,* but did not. *Id.* at 175, n. 9, 89 S.Ct. at 968, n. 9. Under *Alderman,* Mr. McDade would not have standing under the Fourth Amendment, and the Court's intimation that Title III analysis is the same as Fourth Amendment analysis indicates that the Supreme Court would not grant him standing under Title III either. Further, the *Alderman* court made clear that it was not developing new standing law, but rather was stating "existing law." [22] Thus, even if *Rakas* does not apply to Title III, Mr. McDade has no standing under the existing law of 1968 to challenge these wiretaps.

While the Third Circuit has not, to this court's knowledge, considered the precise argument raised by Mr. McDade here, that court has held that a defendant whose own voice is not intercepted by a wiretap of his co-defendants' phones does not have standing to challenge the wiretaps under Title III. *United States v. Armocida,* 515 F.2d 29, 35, n. 1 (1975) (relying on *Alderman*). Thus, even if Mr. McDade were theoretically correct in his belief that Congress intended to include "target standing" in Title III, I could not rule that Mr. McDade has standing to challenge the wiretaps in this case, because I am bound by Third Circuit precedent, which clearly holds that he has none.

Finally, since Mr. McDade has no standing to challenge the constitutionality of the wire-

22. *Alderman* was decided on March 10, 1969, less than ten months after the Senate Report which purported to incorporate "existing law" into Title III was placed into the Congressional Record on May 24, 1968.

taps themselves,[23] he has no right to obtain the wiretap authorization orders.

RACKETEERING

▬ In Count Five of the Indictment, Congressman McDade is charged with Participation in the Affairs of an Enterprise, the Activities of which Affect Interstate Commerce, through a Pattern of Racketeering Activity, under the Racketeering Influenced and Corrupt Organizations ("RICO") Statute, 18 U.S.C. § 1962(c). That section provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Mr. McDade moves the court to dismiss Count Five on the grounds that the government has not adequately pled, and cannot adequately plead, the elements of a RICO violation.

*The Enterprise*

Mr. McDade argues that the government has failed to adequately plead that he was "associated with" a RICO enterprise. The enterprise alleged in the indictment is "The Office of the Honorable Joseph M. McDade." The government alleges that Mr. McDade supervised the operations and staffs of his congressional offices in Washington, D.C., and Scranton, Pennsylvania, and that he supervised congressional staff members on the House Small Business Committee and the House Defense Appropriations Subcommittee. Mr. McDade is alleged to have utilized these offices and staffs to demand and receive bribes and illegal gratuities and to extort other things of value from defense contractors and lobbyists.

Mr. McDade's first argument is that the government cannot prove the existence of the alleged enterprise because to do so would require an inquiry into his legislative acts, which inquiry would violate the Speech or Debate Clause. However, as discussed above, I find that legislative status is not protected by the Speech or Debate Clause. *See supra,* at 1162–1170. If Mr. McDade's status is not protected, it readily follows that neither are those of his employees. Thus, inquiry into the fact that Mr. McDade was a member of Congress, and that members of his staff were employed by the House of Representatives, does not violate the Speech or Debate Clause. Further, as discussed above, the activities alleged here—demands and acceptances of bribes and gratuities—are not legislative acts. Since inquiry into these alleged activities when performed by Mr. McDade himself does not violate the Speech or Debate Clause, then it again follows that inquiry into the activities of members of his staff in furtherance of these alleged activities also does not violate the Clause. The alleged RICO-violative activities and Mr. McDade's motivations for them are not legislative acts, and the alleged enterprise is not "one big legislative act," as Mr. McDade argues, because legislative status is not protected, and because Mr. McDade's staff members are alleged to have done more than just legislative work.

▬ Next, Mr. McDade argues that "The Office of the Honorable Joseph M. McDade" cannot be charged as the RICO enterprise with which he associated because such pleading violates the "enterprise-person" rule. Under that rule, the person charged under RICO must be separate from the enterprise with which he is alleged to have been associated. This rule was created by the courts to try to further RICO's purpose of preventing organized crime from taking over legitimate businesses by punishing the infiltrators rather than the corporation. *See, B.F. Hirsch v. Enright Refining Co.,* 751 F.2d 628 (3d Cir.1984). As the Third Circuit has said, "§ 1962(c) was intended to govern only those instances in which an 'innocent' or 'passive' corporation is victimized by the RICO 'persons,' and either drained of its own money or used as a passive tool to extract money from third parties." *Petro–Tech, Inc. v. Western Co. of North America,* 824 F.2d 1349, 1359 (3d Cir.1987). In *Brittingham v. Mobil Corp.,* 943 F.2d 297, 301 (3d Cir.1991), the Third Circuit held that "a § 1962 enter-

**23.** He may, of course, challenge the admission of the wiretap evidence on other grounds.

prise must be more than an association of individuals or entities conducting the normal affairs of a defendant corporation."

Mr. McDade essentially argues that he *is* "The Office of the Honorable Joseph M. McDade," and that, therefore, he is analogous to the corporation in *Brittingham.* However, the Third Circuit in *Brittingham* also said that "individual defendants, in contrast to collective entities, are generally distinct from the enterprise through which they act. Unlike a collective entity, it is unlikely that an individual defendant by himself would constitute a valid enterprise. Thus, distinctiveness concerns are generally not present when an individual defendant is also part of an association-in-fact that constitutes the enterprise." *Brittingham,* 943 F.2d at 302 (citations omitted). For this proposition, the court cited *United States v. Benny,* 786 F.2d 1410 (9th Cir.1986), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986). In that case, the Ninth Circuit held that the owner of a sole proprietorship which had four employees could be prosecuted under the RICO statute. The court held that, although it is unlikely that a sole proprietor with no employees could "associate" with himself, where the proprietorship has employees, it is a separate entity from its owner, and it can be an enterprise with which the owner can "associate" for RICO purposes. *Accord, McCullough v. Suter,* 757 F.2d 142 (7th Cir. 1985).

■ Mr. McDade further argues that his offices are not the paradigmatic RICO enterprise, which, he says, is the organized crime family where each individual has specific duties and where the organization and its evil purposes continue regardless of the death or imprisonment of any one of the family members. By contrast, he argues, "The Office of the Honorable Joseph M. McDade" will cease to exist when Mr. McDade ceases to be a member of Congress. The offices of the successors to his seat representing Pennsylvania's Tenth District, and to his positions on the committees, will not be a continuation of

Mr. McDade's offices; they will be completely new, with new employees and new agendas. According to Mr. McDade, the government may not charge the offices of a member of Congress as a RICO enterprise because a RICO enterprise must have "continuity", and congressional offices do not have continuity.

The government cites numerous cases in which courts have held that the offices of public officials can be RICO enterprises. In *United States v. Joseph,* 526 F.Supp. 504 (E.D.Pa.1981), the defendant was the Clerk of Courts of Lehigh County, Pennsylvania. The charged enterprise was the office of the Clerk of Courts. In the words of the court:

> defendant argues that he *is* the Clerk of Courts and that it is 'ridiculous' to charge him with being associated with, or employed by, himself. Defendant's argument here, too, misses the mark; the Clerk of Courts of Lehigh County is 'an office', to which eligible candidates seek election.... Joseph, although holding that office is not *the* office, he is merely its manager and caretaker. Upon him falls the primary responsibility to oversee, manage and make certain that the responsibilities of the office are properly discharged.

*Joseph,* 526 F.Supp. at 507 (citations omitted) (emphasis in original). Admittedly, the office of a member of the Congress of the United States is somewhat different from the office of a Clerk of Courts.[24] As Mr. McDade points out, "his" employees will probably lose their jobs when he leaves Congress, presumably unlike the employees in the office of the Clerk of Courts of Lehigh County. But *Joseph*'s reasoning still applies here. Mr. McDade is not his office. Mr. McDade is the Representative from the Tenth District of Pennsylvania and the ranking minority member on two House committees. Along with those positions comes a support staff of Mr. McDade's choosing. Together, Mr. McDade and his staff make up the "The Office of the Honorable Joseph M. McDade."

Other courts have also held that political offices can be charged as RICO enterprises.

---

24. In particular, most positions on the staff of a member of Congress would probably be considered to be sufficiently involved with policymaking so as to fall outside the ambit of *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (holding patronage dismissals unconstitutional except for employees in policymaking positions).

*See, e.g., United States v. Thompson,* 685 F.2d 993 (6th Cir.1982) (*en banc*), *cert. denied,* 459 U.S. 1072, 103 S.Ct. 494, 74 L.Ed.2d 635 (1983) (Office of the Governor of Tennessee); *United States v. Long,* 651 F.2d 239 (4th Cir.1981), *cert. denied,* 454 U.S. 896, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981) (Office of a South Carolina State Senator). The offices of a governor and a state senator, like those of United States Congressman, are made up of employees hand picked by the official. Yet none of those courts dismissed the charges because the defendant *was* the office or because the enterprise was not indefinitely continuous.

▪ As for continuity, an organization need not be indefinitely continuous in order to be charged as a RICO enterprise. During the entire period charged in the indictment, 1983 through 1988, Mr. McDade represented Pennsylvania's Tenth District and was the ranking minority member on the House Small Business Committee. From 1985 through 1988 he was the ranking minority member on the House Defense Appropriations Subcommittee. Throughout this period, Mr. McDade's offices had a continuous existence. Various employees had various specific jobs. Presumably, employees came and went. And when they went, presumably they were replaced, perhaps even augmented. The work of the office, legitimate and allegedly otherwise, went on despite the comings and goings of employees. For the period of time in question, Mr. McDade's offices functioned as a continuous organization in which various replaceable members performed particular roles.

▪ The great weight of authority holds that a sole proprietor or a public official may be charged as associating with his or her proprietorship or office as a RICO enterprise. As the *Thompson* court said, "[t]he case law which has already developed nationwide on the question of identifying a governmental unit as the RICO 'enterprise' is unanimous in rejecting appellants' single appellate contention in this case." *Thompson,* 685

F.2d at 999; *see also,* cases cited therein. The only additional concern potentially raised in this case is that of the Speech or Debate Clause. But as outlined above, I find that this indictment and this definition of the enterprise do not violate the Clause. This case is not different, enterprise-wise, from *Benny, Joseph, Thompson,* or *Long,*[25] and the enterprise-person rule simply has no application where the defendant is an individual rather than a corporation. Further, the Supreme Court has held that "[t]here is no restriction upon the associations embraced by the definition" of "enterprise." *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Therefore, I hold that the government has adequately pled a RICO enterprise.

*The Pattern*

▪ Next, Congressman McDade argues that the government has not adequately pled a "pattern of racketeering activity." The Supreme Court has examined RICO's pattern requirement, holding that "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) (emphasis in original). Although Mr. McDade raised a continuity argument in the context of his enterprise argument, he does not raise such an argument here. I nonetheless note that the activity charged in this case occurred over a closed period of five years, clearly long enough for a jury to find continuity. In *United States v. Pelullo,* 964 F.2d 193, 210 (3d Cir.1992), the Third Circuit held that "19 months is sufficiently longer than 'a few weeks or months' and indicates the type of long-term criminal conduct Congress sought to eradicate in enacting RICO." (quoting *H.J.,* 492 U.S. at 242, 109 S.Ct. at 2902). Here, continuity has been more than adequately pled.

**25.** The only other arguable difference between this case and those is that here the alleged enterprise is an association in fact, whereas in each of those case the enterprise was also its own legal entity. But I see no reason why an amalgamation of the offices of a single Member of Congress should be treated differently from a single governmental office.

Mr. McDade's argument centers on the "relationship" prong of *H.J.*'s definition of "pattern." In *H.J.*, the Court held that the definition of the "relationship" prong under RICO is coextensive with the definition of "pattern" in 18 U.S.C. § 3575(e). *H.J.*, 492 U.S. at 240, 109 S.Ct. at 2901. That section provides: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e). Mr. McDade argues that the 23 predicate acts charged in the RICO count are isolated and sporadic, and that the two conspiracies charged within the RICO count are unrelated.

In *United States v. Riccobene*, 709 F.2d 214, 224–25 (3d Cir.1983), the Third Circuit held "that Congress intended that 'a series of agreements that under pre-RICO law would constitute multiple conspiracies could under RICO be tried as a single 'enterprise' conspiracy' if the defendants have agreed to commit a substantive RICO offense." (quoting *United States v. Sutherland*, 656 F.2d 1181 (5th Cir.1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982)). Therefore, it is irrelevant for RICO purposes whether the alleged predicate acts would comprise two or even more conspiracies.

Further, in *Banks v. Wolk*, 918 F.2d 418, 425 (3d Cir.1990), the Third Circuit held: "Once the requisite connection with the RICO enterprise is shown, the fact that a defendant employed different associates for different predicate acts should not be of overriding significance." Under *Banks*, it is insignificant that Mr. McDade employed different staff members to engage in different alleged predicate acts, and it is also insignificant that he allegedly solicited and accepted bribes and gratuities from different sources. As the *Banks* court said, "we focus on the nature of the alleged criminal activity." *Banks*, 918 F.2d at 425.

Taking the *H.J.* factors one at a time, one sees that the government has alleged a sufficient pattern of racketeering activity. There is a common purpose in all the alleged acts:

the acquisition of things of value as bribes and illegal gratuities in return for promises of influence. There is a common result: the acquisition of things of value as bribes and illegal gratuities in return for promises of influence. There is a common victim: the public, which has a right to the honest, loyal, and faithful services of its elected officials. *See, United States v. Zauber*, 857 F.2d 137 (3d Cir.1988). There is a common method of commission: the demand or acceptance of bribes and illegal gratuities. As for the participants, nine predicate acts involve UCC, two involve Westland, two involve Sperry, two involve Kane Paper, two involve Grumman, and six involve GSGS & B. Although Mr. McDade allegedly associated with various different alleged bribers and gratuity-givers, the distinguishing characteristics of the alleged acts are significant: they all involved Mr. McDade's obtaining bribes and gratuities from people or organizations interested in influencing the government or obtaining government contracts.

Finally, the government must show that the affairs of the enterprise are "conducted" through the alleged pattern of racketeering activity. The Third Circuit has held that "one conducts the activities of an enterprise through a pattern of racketeering when: '(1) One is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise; or (2) the predicate offenses are related to the activity of that enterprise.'" *United States v. Provenzano*, 688 F.2d 194, 200 (3d Cir.1982), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982) (quoting *United States v. Scotto*, 641 F.2d 47 (2d Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981)). Here, with the entire indictment grounded on Mr. McDade's use of his position and control over the affairs of the alleged enterprise, the alleged predicate offenses are clearly related to the activity of Mr. McDade's office.

That more than one "scheme" or conspiracy is alleged here does not take this case out of the RICO statute. The defendant need not have solicited bribes or gratuities from the same source during every predicate act.

Nor does the defendant need to have solicited bribes and gratuities in return for exercising influence in the same way, or on the same executive branch officials. The "pattern" alleged here is one in which the defendant used his offices and his perceived status as a powerful Member of Congress to obtain things of value from persons seeking to influence the government. That he may have employed different means of committing these acts, or associated with different people when committing them, is of no moment. "In cases such as this, which allege multiple fraudulent schemes conducted through an otherwise legitimate entity, the relatedness requirement should not insulate defendants who merely vary the methods by which they defraud their victims." *Banks,* 918 F.2d at 425.

■■■ Mr. McDade also argues that, in order to disprove the pattern, he will be forced to introduce evidence of his legislative acts, which would violate the Speech or Debate Clause. As discussed above, this indictment does not force Mr. McDade to introduce evidence protected by the Speech or Debate Clause. *See supra,* at ——–——. The pattern alleged by the government does not involve any legislative acts. The government has alleged a pattern of illegal, extra-legislative acts by Mr. McDade. If Mr. McDade seeks to disprove the government's assertions that those acts are related, he will not have to [26] introduce evidence of his legislative acts. Rather, he will have to examine each alleged act by itself and show why that act is not related to the others. This will not violate the Speech or Debate Clause.

### The Racketeering Activity

■■■ Congressman McDade also attacks the adequacy of the predicate offenses charged as "racketeering activity." The predicate offenses charged in the indictment are numerous violations of the bribery and gratuities statutes, 18 U.S.C. §§ 201(b)(2) and 201(c)(1)(B) respectively, and extortion in violation of § 1951 of the Hobbs Act. As discussed above, the indictment adequately pleads all the elements of the gratuities statute. *See supra,* at ——–——. Mr. McDade's arguments concerning the bribery statute are identical to those which he made under the gratuities statute, and my reasoning in rejecting those arguments in the gratuities context applies equally in the bribery context, since all the challenged elements appear in both statutes.

Turning to the Hobbs Act, Mr. McDade argues that corrupt intent is an element of extortion. The statute holds criminally liable "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so ..." 18 U.S.C. § 1951(a). The statute goes on to define extortion: "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Mr. McDade argues that the definition of extortion by a public official in the Hobbs Act was derived from the common law definition, which contained corrupt intent as an element. Therefore, the argument goes, the element of corrupt intent is implied in the Hobbs Act and must be pled.

In *Evans v. United States,* 504 U.S. ——, ——, 112 S.Ct. 1881, 1887, 119 L.Ed.2d 57, 70 (1992), the Supreme Court held that "the portion of the statute [the Hobbs Act] that refers to official misconduct continues to mirror the common-law definition." In a footnote, the Court pointed out that "[m]any of the treatise writers explained that at common law, extortion was the corrupt taking or receipt of an unlawful fee by a public officer under color of office." *Evans,* 504 U.S. at ——, n. 14, 112 S.Ct. at 1887, n. 14, 119 L.Ed.2d at 70, n. 14. Mr. McDade uses this footnote as a springboard for his argument that the element of corrupt intent must be read into the statute. He cites no ˙ case, however, which has held that corrupt intent

---

26. Of course, Mr. McDade will not have to disprove anything. It is the government, and the government alone, which will have the unshifting burden of proving every element of every crime charged, beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

is an element of extortion by a public official under the Hobbs Act. As for extortion under color of official right at common law, the authority is split as to whether an official must act with a corrupt intent and whether an honest mistake of fact or law is a defense. *See*, Charles E. Torcia, 4 Wharton's Criminal Law § 697, at 483, n. 10, n. 11, & n. 12 (14th ed. 1981), and cases cited therein.

In support of his argument that the Hobbs Act, despite its failure to mention an intent element, actually includes such an element, Mr. McDade argues that extortion is a crime of specific intent crime rather than one of general intent. In *United States v. Furey*, 491 F.Supp. 1048, 1059 (E.D.Pa.1980), the court, after conducting a lengthy examination of the common law offense of extortion, held:

> The Hobbs Act clearly and revealingly does not contain the 'knowingly' and/or 'willfully' language that brings into play the 'specific intent' exception. Furthermore, the legislative history of the statute indicates that, during the passage of the statute, an amendment had been proposed as an alternative to the present § 1951 which did contain the 'knowingly or willfully' language but was subsequently rejected by Congress. That Congress was aware of the alternate specific intent language but nevertheless did not include it in the presently codified § 1951 clearly indicates that the Hobbs Act was not intended to be a specific intent statute.

(footnote omitted). I find the *Furey* court's reasoning persuasive, at least as to extortion by fear, which that case was about.

Further, it is notable that the Hobbs Act deals with extortion by fear and extortion under color of official right together. At least on the face of the statute, the elements of the two types of extortion seem to be co-extensive. In *Evans*, the Supreme Court did not mention that there might be an addition-al element to the common law crime of extortion under color of official right,[27] even though the question before the Court was about a difference in the elements of extortion by fear and extortion under color of official right.[28] Thus, neither Congress nor the Supreme Court has said that corrupt intent is an element of either of the two types of extortion under the Hobbs Act. This silence is significant because, if there were an intent element in the Hobbs Act's definition of extortion under color of official right, then public officials would be treated differently from private individuals under the Hobbs Act, i.e. public officials, but not private citizens, would have to have a corrupt intent in order to be convicted of extortion. Presumably, Congress or the Supreme Court would have mentioned this important difference if in fact it exists. Instead, the Court said, "[w]e hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.* 504 U.S. at ——, 112 S.Ct. at 1889, 119 L.Ed.2d at 72. That is precisely what the government has alleged here.

 In addition, I hold that, even were corrupt intent an element of extortion under color of official right, this indictment sufficiently pleads that element. In Predicate Act 1, the indictment alleges that Mr. McDade "did unlawfully and knowingly attempt to obstruct, delay and affect interstate commerce ... by obtaining and causing to be obtained $10,000 from representatives of UCC, with those persons' consent, such consent having been induced under color of official right and by a wrongful use of fear of economic loss." In Predicate Act 11(a), the indictment alleges that Mr. McDade "did unlawfully, willfully, and knowingly attempt to obstruct, delay and affect interstate commerce ... by obtaining and causing to be

---

27. In his concurrence, Justice Kennedy did address this question, noting the conflict in the state courts as to whether corrupt intent is an element of extortion at common law. He concluded, "our modern jurisprudence would require that there be a mens rea requirement now." *Evans*, 504 U.S. at ——, 112 S.Ct. at 1893, 119 L.Ed.2d at 78 (Kennedy, J., concurring in part and concurring in the judgment).

28. Specifically, the Court held that the "inducement" requirement in § 1951(b)(2) applies only to private individuals, and that, even if it applied to public officials, the "coercive element would be satisfied by the public office itself." *Evans*, 504 U.S. at ——, 112 S.Ct. at 1888, 119 L.Ed.2d at 71.

obtained from representatives of Westland, the payment of jet aircraft transportation from Washington, D.C. to VanNuys, California, with those persons' consent, such consent having been induced under color of official right and by a wrongful use of fear of economic loss."

■■■■ "Knowingly" means "that the defendant knows factually what he is doing," *United States v. Baytank (Houston), Inc.,* 934 F.2d 599, 613 (5th Cir.1991), or that the defendant acted with "actual consciousness." *United States v. Bader,* 956 F.2d 708, 710 (7th Cir.1992). To act "unlawfully" means simply to act in violation of the law. *See, United States v. Busic,* 587 F.2d 577 (3d Cir.1978). Thus, to act "knowingly and unlawfully" is to act consciously in violation of the law. In *United States v. Malinowski,* 472 F.2d 850, 853 (3d Cir.1973), the Third Circuit upheld the district court's definition of "willfully" as "done voluntarily and intentionally, and with the specific intent to do something the law forbids." Thus, the addition of "willfully" to "knowingly and unlawfully" adds, if anything, an additional allegation of purposeful action.

In *Malinowski,* the Third Circuit also held that " 'bad purpose' and 'evil purpose' are not 'magic words' which must be included in a jury charge on wilfulness." *Malinowski,* 472 F.2d at 855. The same is true here. The words "corrupt intent" are not magic, and especially in light of the doubt over whether corrupt intent is even an element of the crime of extortion, the government cannot be expected to use those precise words in the indictment. The decision whether to dismiss a count of a criminal indictment should not turn on the government's inclusion or omission of specific words. Rather, the court should examine the overall conduct alleged. Here, the charging language of the alleged ˑpredicate acts of extortion, taken as a whole, alleges that Mr. McDade acted knowingly and intentionally in violation of the law to obtain things of value for himself in return for exercising his influence as a United States Congressman.

In *United States v. Reeves,* 752 F.2d 995, 998 (5th Cir.1979), the court held that " 'corruptly' ordinarily describes '[a]n act done *with an intent to give some advantage* inconsistent with the official duty and rights of others.' " (quoting *United States v. Ogle,* 613 F.2d 233, 239 (10th Cir.1979)) (emphasis supplied in *Reeves*). In *United States v. North,* 910 F.2d 843, 881 (D.C.Cir.1990), the court wrote: "[a] 'corrupt' intent may also be defined as 'the intent to obtain an improper advantage for [one]self or someone else, inconsistent with official duty and the rights of others.' " (quoting Ballentine's Law Dictionary 276 (3d ed. 1969)). Although the government here does not specifically use the words "corrupt intent" or "corruptly" in the indictment, its allegations charge precisely the type of behavior described by these courts.[29] Thus, I find that, even if corrupt intent is an element of the crime of extortion under the Hobbs Act, the government has adequately pled that element.

■■■ Congressman McDade also argues that the indictment's Hobbs Act allegations fail to include a quid pro quo. As discussed above, there is no quid pro quo requirement under the Hobbs Act outside the context of campaign contributions. Thus, the government need not plead a quid pro quo for Mr. McDade's alleged demand and acceptance of funds for the "Five Great Americans Concert", or for travel expenses, since these actions are not afforded the special First Amendment status granted to campaign contributions. *See supra,* at 1170–1172.

■■■ Finally, Mr. McDade argues that the Hobbs Act allegations are duplicitous because they allege both extortion by fear and extortion under color of official right.

---

29. Additionally, I note that in *United States v. Poindexter,* 951 F.2d 369, 379 (D.C.Cir.1991), the court held that, in the context of 18 U.S.C. § 1505, "the term 'corruptly' is too vague to provide constitutionally adequate notice that it prohibits lying to Congress." In reaching this conclusion, the court relied on the traditional definitions, both in legal opinions and in dictionaries, of "corrupt" and "corruptly." Thus, in asking the court to read a corrupt intent requirement into § 1951 of the Hobbs Act, Mr. McDade is asking the court to read an element into a statute that, if included in the facial language of the statute itself, might render the statute unconstitutionally vague.

The rule against duplicity prohibits the government from joining two or more distinct offenses in a single count, because if a jury were to return a general verdict on a duplicitous count, it would be unclear as to which offense the defendant had been convicted or acquitted. *United States v. Starks,* 515 F.2d 112 (3d Cir.1975). However, the rule does not prohibit the government from alleging two or more methods of completing the same crime in a single count. "[D]eciding that there are separate offenses must be supported by a finding of legislative intent to provide multiple punishment for the same conduct." *United States v. Milestone,* 626 F.2d 264, 269, n. 8 (3d Cir.1980). Here, the government has alleged that Mr. McDade violated the Hobbs Act both under color of official right and through fear. Extortion is one crime. The two methods of accomplishing it are listed together in one section. It may be committed by instilling fear in the victim, or it may be committed under color of official right. But it is one crime carrying one punishment. Mr. McDade cannot be punished twice for the same alleged act of extortion. Therefore, the government's joinder of allegations of extortion by fear and extortion under color of official right does not violate the rule against duplicity. *See, United States v. Ray,* 690 F.Supp. 508, 512 (M.D.La.1988).

■ Mr. McDade also makes an argument based on the Speech or Debate Clause. He argues that, in order to prove that he acted "under color of official right," the government will have to introduce evidence of his legislative status and his legislative acts. As discussed above, legislative status, by itself, is not protected by the Speech or Debate Clause. *See supra,* at 1165–1168. And the indictment does not make reference to any of Mr. McDade's legislative acts. The acts charged here are extra-legislative, and prosecution of them does not implicate the Speech or Debate Clause.

■ Under extortion by fear, the reasonableness of the victim's fear is a factor. As stated above, the proof or disproof of the reasonableness of the victims' fears will not require the introduction of evidence protected by the Speech or Debate Clause, since instructive or educational evidence about the procedures of Congress and Congressional committees is not protected by the Speech or Debate Clause. *See supra,* at 1168–1169.

*Conclusion*

Because I find that (1) Count Five of the indictment adequately alleges all the elements of a RICO violation, including a valid enterprise and a sufficient pattern of racketeering activity, (2) the indictment adequately alleges all the elements of the charged predicate offenses of bribery, acceptance of illegal gratuities, and extortion, (3) Count Five of the indictment is not duplicitous, and (4) Count Five of the indictment does not violate the Speech or Debate Clause, I shall not dismiss Count Five, the RICO count, of the indictment.

BILL OF PARTICULARS

■ Next, Congressman McDade moves the court to order the government to provide a bill of particulars under Federal Rule of Criminal Procedure 7(f). The Third Circuit has held that the trial court has broad discretion in deciding whether to require a bill of particulars. *United States v. Addonizio,* 451 F.2d 49, 64 (3d Cir.1972), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). The defendant need not show cause to obtain a bill of particulars, but a bill of particulars is meant to serve a specific purpose, namely " 'to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense.' A bill of particulars should fulfill this function 'when the indictment itself is too vague and indefinite for such purposes.' " *Addonizio,* 451 F.2d at 63–64 (citations omitted). The Third Circuit observed that one purpose of a bill of particulars is to diminish the "sporting theory" of criminal justice, but also that "a defendant is entitled neither to a wholesale discovery of the Government's evidence, nor to a list of the Government's prospective witnesses." *Id.* (citations omitted).

In this case, the government has issued a 43–page amended indictment against Con-

gressman McDade. It has also provided voluminous discovery. Mr. McDade has a highly competent defense team of perhaps a dozen members, which has been examining the government's disclosures for nearly a year now. The motions filed throughout this case by Mr. McDade's counsel, and the performance of his counsel during the numerous oral arguments and conferences in the case, convince the court that Mr. McDade and his counsel are well-informed of the charges against him and have more than enough information to prepare an adequate defense.[30]

In *United States v. Kenny,* 462 F.2d 1205, 1212 (3d Cir.1972), the Third Circuit affirmed the district court's refusal "to require the Government to answer a set of detailed interrogatories in the guise of a bill of particulars." Mr. McDade's request here is 20 pages long, and it reads very much like a set of detailed interrogatories. It is not necessary for the government to disclose the names of all of Mr. McDade's alleged co-conspirators or all the overt acts allegedly performed by Mr. McDade in furtherance of the conspiracy, unless the failure to disclose such information would prevent the defendant from adequately preparing a defense. In this case, the indictment is detailed enough, and discovery has been generous enough, to present Mr. McDade with a clear picture of the charges against him and to enable him to prepare an adequate defense. The government is not required to "weave the information at its command into the warp of a fully integrated trial theory for the benefit of the defendants." *Addonizio,* 451 F.2d at 64. Therefore, I shall deny the motion for a bill of particulars.

VENUE

Finally, Congressman McDade requests the court to transfer this case to the Middle District of Pennsylvania, which encompasses Mr. McDade's entire congressional district and in which he resides,[31] for trial. Mr. McDade argues that most of the alleged activities in this case took place either in the Middle District of Pennsylvania or in the District of the District of Columbia, and that the government filed this case in the Eastern District of Pennsylvania, where venue is artificial, for strategic reasons.

The Constitution states: "The Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed." U.S. Const., art. III, § 2, cl. 3. The Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed ..." In *Platt v. Minnesota Mining & Mfg. Co.,* 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964), the Supreme Court held that a defendant has no right to be tried in his home district. Rather, the constitutional venue consideration is the determination of where the crime was committed. *Platt,* 376 U.S. at 245, 84 S.Ct. at 772.

In a case such as the one at bar, where the alleged crimes took place in multiple districts, 18 U.S.C. § 3237(a) becomes relevant. That section provides: "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). Congressman McDade does not dispute that venue is proper in the Eastern District of Pennsylvania, since the government has alleged at least one act which occurred in the Eastern District in each count of the indictment. Rather, Mr. McDade argues that the court should exercise its broad discretion under Federal Rule of Criminal Procedure 21(b) to transfer the

---

**30.** In fact, in December, 1992, Mr. McDade's counsel complained to the court that the government had provided *too much* discovery, and that the defense team was having trouble sifting through it all. In an attempt to help the defense team zero in on the government's case and to avoid unnecessary duplicity, this court issued a Memorandum and Order directing the government "to tell the defense of any discrete parcels of material that it does *not* plan to use at trial."

*United States v. McDade,* 61 U.S.L.W. 2413, 1992 WL 382351 (E.D.Pa. Dec. 11, 1992) (Crim.A. No. 92–249) (emphasis in original).

**31.** The government points out that Mr. McDade's principal residence, albeit not his domicile, might actually be in the Eastern District of Virginia, where he lives while Congress is in session.

case for the convenience of the parties and witnesses.

Rule 21(b) provides: "For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another district." Fed. R.Crim.P. 21(b). In *Platt*, the Supreme Court listed ten factors for district courts to consider when deciding whether to transfer a case under Rule 21(b). They are: (1) location of the defendant, (2) location of possible witnesses, (3) location of events likely to be in issue, (4) location of documents and records likely to be involved, (5) disruption of defendant's business if the case is not transferred, (6) expense to the parties, (7) location of counsel, (8) relative accessibility of place of trial, (9) docket condition of each district involved, and (10) any other special elements. *Platt*, 376 U.S. at 243–44, 84 S.Ct. at 771–72.

I analyze the *Platt* factors seriatim. As for the first factor, location of the defendant, Mr. McDade apparently splits his time between Scranton and the Washington, D.C. area, not a dispositive reason to transfer this case to the Middle District.

As to the second factor, location of witnesses, the government has stated that it intends to call approximately twenty witnesses who reside in the Eastern District, and only three who reside in the Middle District. Mr. McDade says that he intends to call many character witnesses who reside in the Scranton area.[32] But the Northeast Extension of the Pennsylvania Turnpike allows one to drive from Scranton to Philadelphia in less than three hours, which is not so great a trip as to require a transfer.

As for the location of the events at issue in this case, UCC, which is a major player in three of the five counts in the indictment, is incorporated in Lancaster, in the Eastern District of Pennsylvania, and the checks allegedly sent from UCC to Mr. McDade were drawn on accounts in the Eastern District. While some of the alleged events did occur in the Middle District, most of them simply

involve Scranton as being the destination for some of the flights allegedly taken by Mr. McDade. Mr. McDade argues that the "nerve center" theory for transfer articulated in *United States v. Haley*, 504 F.Supp. 1124 (E.D.Pa.1981), should persuade the court to transfer this case to the Middle District. But there is a significant difference between *Haley* and this case. In *Haley*, the defendants requested, and were granted, transfer of their case to the district in which the "nerve center" of their alleged activities was located. In contrast, if there is a "nerve center" in this case, it is in the District of the District of Columbia, where most of Mr. McDade's congressional work, and especially his committee work, takes place. Yet Mr. McDade requests a transfer to the Middle District of Pennsylvania, which is no more the "nerve center" of the activities alleged in this case than is the Eastern District of Pennsylvania.

The fourth factor, the location of documents, also advises the court against a transfer. There are three major document repositories in this case. They are located in Philadelphia, New York City, and Arlington, Virginia, none of which is located in the Middle District of Pennsylvania.

The next factor is the disruption of the defendant's business. Granted, being involved in a criminal trial will undoubtedly disrupt Mr. McDade's ability to function as a United States Congressman. But I do not find that holding the trial in Philadelphia will provide substantially greater disruption than would holding it in Scranton. The House of Representatives sits in neither place, nor generally do its committees. While Mr. McDade does have an office in Scranton, he still could not function normally out of that office, since he could not participate in House debates and committee meetings, and since he would be in court during most business hours. Modern conveniences such as the telephone and the fax machine will make it equally easy for Mr. McDade's Washington staff to communicate with him in Philadelphia or in Scranton. And Mr. McDade's

---

32. The government has moved to exclude, or at least to substantially limit, the testimony of many of these witnesses. I shall address that motion

during trial, in the context of the record which has been developed at that time.

Scranton staff has, no doubt, often gone for lengthy periods without the presence of Mr. McDade. Standing trial in Philadelphia will not disrupt Mr. McDade's business substantially more than any other defendant's business is disrupted by having to defend criminal charges. Wherever the trial takes place, it is the fact of the trial, not its situs, which will be the preoccupying factor tending to distract Mr. McDade from the performance of his congressional business.

As for the rest of the *Platt* factors, the combined expense to Mr. McDade and the government is not likely to be much different in Philadelphia from that in Scranton. Mr. McDade has retained counsel in both locales, as well as counsel from elsewhere, and both of the government's counsel are located in Philadelphia. I find Philadelphia to be as accessible as, if not more accessible than, Scranton for the defendant, counsel, the potential witnesses, and interested observers. Finally, as to the last factor, this court's docket is current, and even if it were not, this case would get a priority listing under the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, since it is a criminal case.

 Mr. McDade also argues a special, pragmatic consideration. In order to convict a defendant of a crime, the government must prove venue. *United States v. Passodelis*, 615 F.2d 975 (3d Cir.1980). Mr. McDade argues that, since some of the counts of the indictment contain tenuous connections to the Eastern District, the government may have a difficult time proving that Mr. McDade engaged in illegal activity in this district. Therefore, some of the charges against Mr. McDade might have to be dismissed at the close of the government's case, or any convictions might be reversed on appeal. But that is not a consideration for the court at the pretrial stage. For better or for worse, the government has chosen to bring this case in the Eastern District, and it has assumed the jurisdictional risks inherent in that decision. If it fails properly to establish venue for any of the crimes charged, those counts will be dismissed at the appropriate time. If the court wrongly declines to dismiss those counts, the convictions will likely be reversed on appeal. This is so in every criminal case. But, for now, my consideration is whether the government has *alleged* proper venue. It has. Any concern over proof of venue can be taken up during trial, and should that proof fail, it should ultimately work to the defendant's benefit.

At oral argument, counsel for Mr. McDade brought up another special consideration, one that I regard as having more substance in this case than the litany of change-of-venue criteria just discussed. He argued that Mr. McDade would not get a fair trial in Philadelphia because the jury would not give much heed to the character testimony of Mr. McDade's witnesses. Mr. McDade argues that, since Philadelphians consider themselves to be more sophisticated than their neighbors in other parts of the Commonwealth of Pennsylvania, they will not view Mr. McDade's character witnesses, most of whom will hail from small towns in Mr. McDade's congressional district, as knowledgeable, reliable, credible witnesses. According to Mr. McDade, some of these witnesses will be prominent members of their communities, deserving of the jury's highest regard, but a jury full of Philadelphians will give less credence to the testimony of small town leaders than would residents of other small towns.

I do not necessarily accept Mr. McDade's assertion that Philadelphians are, on the whole, closed-minded and condescending.[33] On the contrary, they strike me as a varied batch. But more significantly, Philadelphia makes up only part of the Eastern District of Pennsylvania. The Eastern District consists of ten counties, many of which are rural and most of which contain small towns. The jury panel in this case will presumably comprise people from all over the Eastern District, thereby containing Philadelphians, rural residents, and small-town natives alike.

---

**33.** I do note, however, that it seems common of Philadelphians generally, and perhaps Philadelphia lawyers in particular, to refer to the other 66 as "the counties," as if the City of Brotherly Love were not itself a county. This has always struck me as displaying a touch of supercilious, parochial, geographic myopia. However, I think the term's use is mainly confined to members of the bar, who even now are but a minority of the city's population.

In addition, the government points out that it would be equally, if not more, difficult to get a fair jury in the Scranton area, where nearly everyone at least knows of Mr. McDade, and where this case has received plentiful press coverage.[34] For this reason, the practical effect of this motion is substantial. At oral argument, counsel for Mr. McDade conceded that Mr. McDade would be more likely get a favorable array of prospective jurors when picking from his friends, neighbors, and constituents, than he would in a relatively strange vicinage.

By all accounts, Congressman McDade has worked to some considerable effect to rejuvenate the economy in his congressional district, and that fact has not gone unappreciated on the home front. But just as judge-shopping should be eschewed, so should jury-shopping. There is no suggestion that the defendant could not get a fair trial in the hands of twelve citizens of the Eastern District of Pennsylvania, but there is some suggestion that the government could perhaps get less than a fully unfair trial were the case tried in Mr. McDade's congressional district. It must be remembered that it is not just the defendant, but also the government, that is entitled to a fair trial.

But neither of those factors is the real reason for my ruling. Rather, I have sought to make this venue call on a straight application of established caselaw to the facts of this case. To sum up, I find that venue is proper in the Eastern District of Pennsylvania, and that neither the *Platt* factors nor the additional arguments raised by Congressman McDade justify transferring this case to the Middle District of Pennsylvania, especially in light of the contiguous proximity of the two districts. Although it is arguably within the discretion of the court to transfer this case, Mr. McDade will not be prejudiced by having to stand trial in Philadelphia, and Scranton would not be a more convenient place to try the case. I conclude that this case is not an appropriate one for my stepping in and divesting the government of its legally proper election of venue.

An Order follows.

## ORDER

AND NOW, this 6th day of May, 1993, upon careful consideration of all the pretrial motions of the defendant, and after argument in open court, the following motions are DENIED:

Motion to Dismiss the Indictment to the Extent that it Contravenes the Speech or Debate Clause

Motion to Dismiss the Indictment for Failure to Plead Adequately the Elements of 18 U.S.C. § 201(c)(1)(B)

Motion to Dismiss Counts I and III for Failure to Plead Adequately the Elements of Conspiracy

Motion for Pretrial Disclosure of Co-Conspirators' Statements and for Pretrial Proof of Connection to the Conspiracy

Motion for Pretrial Standing under Title III to Obtain Evidence Related to Other Conspiracies

Motion to Dismiss Count Five for Failure to Allege the Elements of a RICO Violation

Motion for Bill of Particulars

Motion to Transfer to the Middle District of Pennsylvania

## ORDER

AND NOW, this 6th day of May, 1993, upon careful consideration of all the pretrial motions of the government, and after argument in open court, the motions are resolved as follows:

Omnibus Motion in Limine is DENIED as unripe. The issues of the admissibility of prosecutorial motive in seeking the indictment, the non-criminal behavior of the defendant on other occasions, specific instances of the defendant's good conduct, and the intent and opinions of other legislators regarding the merits of specific leg-

---

**34.** Again, however, the Middle District consists of a much wider area than just Scranton. Specifically, that district includes 32 counties and many cities and towns, including the Harrisburg metropolitan area.

islation shall be addressed when and if they arise during trial.

Motion in Limine DENIED as unripe. The issue raised in this motion shall be addressed when and if it arises during trial. The papers filed in support and in opposition to this motion shall remain under seal.

Motion to Admit Tape Recordings and Video Recordings is DENIED. The procedure for ascertaining the accuracy of any tapes offered into evidence in this case shall be in accordance with this court's Standing Order on that subject, a copy of which is attached.

Motion for Production of Statements of Witness Pursuant to Fed.R.Crim.P. 26.2 is GRANTED. Pursuant to the agreement of the parties, the defendant shall produce the statements of its witnesses as far in advance of the anticipated beginning of the defense case as the government produces the statements of its witnesses in advance of its case. The parties shall attempt to come to an agreement on the specific amount of time.

Motion for Production of Objects Pursuant to Fed.R.Crim.P. 17(c) is GRANTED. At oral argument, the parties represented to the court that they could come to an agreement on the time for production of the objects. They shall be permitted to do so.

■ In addition, the parties have filed supplemental motions relating to the production by the defendant of original checks, check stubs, and travel and itinerary binders. After careful consideration of those motions, and after telephone conference, the government's Supplemental Motion for Production of Documents Pursuant to Fed.R.Crim.P. 17(c) is DENIED, and the defendant's Motion to Quash the Subpoena Seeking Production of Documents is GRANTED.*

### *STANDING ORDER*

Procedure for Ascertaining Accuracy of Transcripts of Electronic Tapes Under the Doctrine of *U.S. v. Starks*, 515 F.2d 112 (3d Cir.1975)

1. Copies of electronic recordings intended to be used at trial shall promptly be given to defense counsel, together with proposed transcript.

2. Defense counsel shall promptly review and compare the two to ascertain accuracy.

---

* The government acknowledges that it has received copies of all the documents at issue in these motions. However, the government asserts that it is entitled to Congressman McDade's ordering of the documents, i.e. the sequence in which he, his staff, and his counsel placed them. Apparently, Mr. McDade turned over the documents, in order, during the grand jury proceedings. The documents then passed through various hands, including Mr. McDade's former counsel, counsel for the House of Representatives, counsel for the government, and the grand jury. When the documents finally reached Mr. McDade's current counsel, they were in disarray, their orderly order seemingly shuffled. Mr. McDade's counsel then re-ordered the documents.

According to the government, the documents are discoverable in their new configuration, since that configuration is merely a reproduction of the original order. But Mr. McDade's counsel, Salvatore Cognetti, Esquire, has represented to the court that the current configuration is not merely a reproduction of the original order, but rather a hybrid of the original order and a classification prepared in anticipation of trial. Therefore, he argues, the current ordering is attorney work product. Further, he seems to suggest

that, even for those portions of the current composition which are not reflective of original thought, but a reiterative reconstruction of the original sequence, the labor taken to arrive at that reconstructed order was that of attorneys, and that therefore the government should not be allowed to partake of the product of that work.

In *Sporck v. Peil*, 759 F.2d 312, 316 (1985), the Third Circuit held that "the selection and compilation of documents by counsel in this case in preparation for pretrial discovery falls within the highly-protected category of opinion work product." Even if I were to conduct an *in camera* review of these documents, I would have no way of telling whether the documents are in their original order or an order which contains a trial-preparatory motive. The persons best situated to make this determination are Mr. Cognetti and Mr. McDade's secretary, Ms. Carol Berg. Taking Mr. Cognetti at his word, I find that the production of these documents would raise considerable work product concerns under *Sporck*. Further, the government has at its disposal the ability to reproduce, at least to a large extent, the original order of the documents. For example, the government could take the deposition of Ms. Berg, and ask her to help put the documents back in order. Therefore, I shall not order Mr. McDade to turn over the re-configured binders.

3. Should there be disagreement on that point—as to whether the words on the transcript accurately set forth what was actually said, and as to the identity of the voices—all counsel, prosecution and defense, shall forthwith convene to listen to the *original* of the tape, to compare it to the transcript.

4. Should that hearing at first fail to solve aural ambiguities, counsel shall avail themselves of further technology to try to ascertain the truth of what was said. For example, counsel are instructed to use an electronic tape player that can be slowed, so that the sounds on the tape, which often come out in seemingly undecipherable rapid succession, can be fairly deciphered. So also, should counsel wish, they may avail themselves (during off-court time, of course) of the state-of-the-art electronic playback equipment in Courtroom 7B, in an effort to get further clarity. Counsel shall make a good faith effort, without, of course, abandoning their allegiance to their clients, to get these issues resolved without the necessity of court intervention. If deemed necessary, with due regard for due process and fairness, the defendants may be present during this process.

5. Should all that fail, and only should all that fail, counsel shall notify my Deputy Clerk, at 215–597–6271, to set up a hearing—in both senses of the word—for the court to resolve any extant disagreements as to verbal intelligibility or identification. That shall be done *within sufficient time,* considering the length of tape needing to be heard, and perhaps re-heard, and the number of unresolved objections and disagreements, so as *not to delay* start of *trial.*

6. Any other, non-*Starks* evidentiary objections, such as relevance, hearsay, or confrontation problems under *Bruton v. U.S.,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), or whatever, may then be identified, but generally shall not then be resolved, but shall await resolution during the course of the trial.